**STATE ex rel. Sandra KEMPER,
Relator,**

v.

**The Honorable David Lee VINCENT,
Respondent.**

No. SC87246.

Supreme Court of Missouri,
En Banc.

May 16, 2006.

Susan K. Roach, Melissa A. Featherston, Shaun M. Falvey, Clayton, for Relator.

Sheila Whirley, John J. Duepner, Office of Prosecuting Atty., Clayton, for Respondent.

MICHAEL A. WOLFF, Chief Justice.

Does the constitutional prohibition of double jeopardy bar a second trial after a court-declared mistrial in the first trial? The inquiry in this case centers on whether granting a mistrial was a "manifest necessity."

The state introduced Sandra Kemper's confessions to setting a fatal fire in her home. The confessions came after police told Kemper that she had failed a polygraph test. The trial court permitted Kemper's defense to introduce the results of the polygraph that showed she did not fail it; some of the details of her confession were inconsistent with the physical evidence. The trial court, on its own and over the objections of the defense, granted a mistrial after deciding that admission of the polygraph result was error.

The circumstances of this case show no manifest necessity for a mistrial. A second trial will violate the double jeopardy provision of the United States Constitution.

## The Circumstances of this Case

Kemper's son, Zachariah, was killed in a fire at the family's home in November 2001. Kemper escaped the fire unharmed, as did her husband, her mother, and an adult friend who lived in the home. Investigators determined that the fire, which started in the basement area where Kemper and Zachariah slept, was intentionally set.

Approximately four months after the fire, in March 2002, Kemper was taken into police custody and interrogated for several hours. During the initial interrogation, Kemper repeatedly denied any part in the fire. A police detective administered a polygraph examination, which took nearly three hours. During the pre-examination interview, Kemper stated that she woke up, smelled smoke, and saw three-foot high flames engulfing a mattress between the water heater and the dryer. After calling for Zachariah and receiving no answer, she went upstairs to get a fire extinguisher, forgetting that there was also an extinguisher in the basement. When she tried to go back down the stairs, the smoke was too thick and she could not make it back down.

The detective told Kemper that the polygraph examination would reveal whether she was lying and that if she was telling the truth, she would pass the test. During the polygraph, Kemper denied setting the fire, helping someone else set the fire, or knowing who had set the fire.

After the polygraph, the detective told Kemper that the test had shown that she was lying about not being involved with the fire and that she needed to tell the truth. Kemper made two confessions later that evening, stating that she had planned the fire to obtain insurance payments. She said that, after everyone was asleep, she sprayed the trashcan in the basement with hairspray and set it on fire with her lighter. She then said she watched the fire burn for 20—30 minutes before going upstairs. When she unexpectedly encountered her husband in the kitchen, she got a fire extinguisher and pretended to be trying to put the fire out.

Some of the statements Kemper made in her confessions after the polygraph test were not consistent with the physical evidence. For example, the state's expert testified that it would have been impossible for anyone to remain in the same room with the fire for more than five minutes after it was set.

Kemper was charged with arson, first-degree murder, and three counts of first-degree assault.

Kemper endorsed Dr. David Raskin, an expert on polygraph examinations, as an

expert witness. The state filed a "Motion in Limine to Exclude Evidence of Defendant's Polygraph Examination." The trial court overruled the motion and ruled that evidence of the polygraph could be admitted if the state attempted to introduce either of Kemper's confessions.

Before trial, Kemper's attorney requested that the prosecution produce any and all records related to Kemper's polygraph examination. Nothing was produced. During his deposition, the detective denied that he used or had a "polyscore" printout that would detail Kemper's scores.[1] The prosecutor subsequently learned that, even if the detective had not used the polyscore, the polygraph equipment would have made such a report. The prosecutor obtained the report and turned it over to Kemper's attorney six days before trial.

At trial, the state played for the jury Kemper's two taped confessions, made following the polygraph test, and the detective's statements that she had failed the polygraph. The state also elicited that the detective had told other police officers that Kemper had shown "signs of deception" on the polygraph.

After this testimony, the trial court judge, outside the jury's presence, stated that he had planned to rule that polygraph results are inadmissible, but that the prosecution had "opened the scope of that issue when you examined this last witness on signs of deception." Thus, the trial court told Kemper's attorney that "through your [expert] witness, you will be able to give— to respond to the signs of deception."

Dr. Raskin, Kemper's expert, then testified as to his interpretation of the polygraph score. Specifically, he said that the results showed an 88 percent probability that Kemper was telling the truth when she denied involvement in the fire. "It

clearly was not a deceptive result," Dr. Raskin testified. "I think it would require a stretch of the imagination to find her deceptive. The results were far from a deceptive result." Later, he confirmed these statements: "very likely she was being truthful when she answered the relevant questions, denying any involvement in the fire, in setting the fire and participating in it."

Dr. Raskin also testified about the behavior of the detective in administering and interpreting the test, as follows:

Q. [By Kemper's attorney]: Okay. Did she pass the test?

A. Yes.

Q. Did he tell her after the test that she failed it?

A. Yes.

Q. And what is the significance of that, from a polygraph science standpoint?

A. Well, he misrepresented the results to her. And it was incorrect. And, therefore, it has a chilling effect on a person, if they are telling the truth, that they are now told that they failed. Especially if it's an important matter like this, and their life may be on the line.

. . .

A. Overall, my opinion is that this was a grossly substandard polygraph examination. It not only violated many of the fundamental procedures that are necessary to conduct a proper polygraph for the purpose of assessing truth or deception, it apparently—and the way it was conducted and the way it was used was designed simply for the purpose of breaking her down and giving her information during the pretest that would make it easier for him to extract a statement from her in which she admitted that she set the fire.

1. The detective died before trial and therefore did not testify at trial.

This test was so substandard that I can only think of one other videotape of an examination that I've reviewed that was worse in that regard.

## The Mistrial

The day after Dr. Raskin testified, the trial court *sua sponte* revisited the polygraph admissibility issue. The judge said that, when he made his original order, "I thought [the polygraph results were] relevant at that time, to show whether or not the defendant was coerced into giving a confession.... Upon further examination of Missouri law, ... the results of polygraph examinations are inadmissible as evidence...." The trial judge then declared a mistrial, *sua sponte*, over Kemper's objection. The judge stated that there was "manifest injustice" presented by the admission of the polygraph results, so as to justify a *sua sponte* mistrial. Kemper requested that the court consider less drastic remedies, such as a limiting instruction.

After the mistrial, Kemper filed a motion to dismiss based on double jeopardy. In overruling the motion, the trial court indicated that Kemper's attorney had exceeded the scope of the court's earlier orders by eliciting evidence of the results of the polygraph, not just the fact that the polygraph had been taken. The case was set for retrial, and Kemper filed this petition for writ of prohibition, requesting that the case be dismissed for lack of jurisdiction. This Court granted a preliminary writ, which is now made absolute.

## Standard of Review

■ "A mistrial is a drastic remedy, granted only in extraordinary circumstances." *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994). Whether to grant a mistrial is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Clover*, 924 S.W.2d 853, 856 (Mo.

banc 1996). An abuse of discretion occurs when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804 (Mo. banc 1988).

■ A writ of prohibition is appropriate "(1) to prevent the usurpation of judicial power when the trial court lacks jurisdiction; (2) to remedy an excess of jurisdiction or an abuse of discretion where the lower court lacks the power to act as intended; or (3) where a party may suffer irreparable harm if relief is not made available in response to the trial court's order." *State ex rel. Proctor v. Bryson*, 100 S.W.3d 775, 776 (Mo. banc 2003). A writ of prohibition is appropriate here because the trial court abused its discretion in granting the mistrial and now seeks to act outside its constitutional authority in retrying Kemper.

## The Rule of Completeness

■ The results of a polygraph examination generally are inadmissible in Missouri criminal trials. *State v. Biddle*, 599 S.W.2d 182, 185 (Mo. banc 1980). Even the fact that a defendant took, refused to take, or was willing to take a polygraph is inadmissible. *Id.* The parties may not waive this inadmissibility with a stipulation. *Id.* at 188.

■ Although inadmissible on the question of Kemper's truthfulness, the polygraph evidence may be considered under what courts and lawyers refer to as the "rule of completeness." This "rule" holds that a party may introduce evidence of the circumstances of a writing, statement, conversation, or deposition so the jury can have a complete picture of the contested

evidence introduced by the adversary. *See* William A. Schroeder, *Missouri Practice, Missouri Evidence,* § 106.1 (2nd Ed.1999).

The "rule" is stated: "where either party introduces part of an act, occurrence, or transaction, the opposing party is entitled to introduce or to inquire into other parts of the whole thereof in order to explain or rebut adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary—a rule that has been held to apply even though the evidence was in the first place illegal." *State v. Baldwin,* 808 S.W.2d 384, 390 (Mo.App.1991). Kemper argues that this exception applies in this case and that the polygraph results should have been admissible.

If the trial court had not granted a mistrial, this rule would apply to support the trial court's initial decision to allow admission of the polygraph evidence. The detective told Kemper that if she told the truth, she would pass the test. Then, even though the results indicated that she had told the truth, he told her that she had failed. These statements appeared to be instrumental in causing Kemper to make the confessions that formed the basis of the state's case against her. It would be fundamentally unfair to allow those confessions into evidence without allowing Kemper to demonstrate the circumstances surrounding the confessions—namely, that police officers did not tell her the truth about whether she passed the polygraph examination. This is consistent with prior cases that have allowed polygraph evidence to be admitted. *See, e.g., Baldwin,* 808 S.W.2d at 391–92; *State v. Mick,* 546 S.W.2d 508, 509 (Mo.App.1976) (overruled on another issue by *State v. Biddle,* 599 S.W.2d 182, 186 (Mo. banc 1980)).

The state argues that, because Kemper's attorney said in her opening statement that she would call a polygraph expert to testify, the state did not "open the door" by first mentioning the polygraph. This argument misses the mark. The issue of which party first introduced evidence of the polygraph does not control the issue of admissibility. Rather, it is the fact that the state introduced Kemper's confessions—which apparently were made, in part, because of the incorrect statement that she failed the examination—that makes the results admissible in this case. The polygraph test and results are admissible because they formed the circumstances surrounding the confessions that are the basis of the State's case. The credibility of a confession is a matter for the jury, and evidence of the circumstances surrounding the confession is essential in order for the jury to assess credibility. *Crane v. Kentucky,* 476 U.S. 683, 688–89, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).

## Double Jeopardy and Manifest Necessity

In this case the trial court granted a mistrial on its own motion. The determination that the polygraph evidence was properly admitted does not end the issue. Rather, the Court must analyze whether double jeopardy prevents the state from retrying Kemper.

 Both the Missouri and United States Constitutions protect against double jeopardy. The Missouri provision does not help Kemper because it applies only to retrial after an acquittal. Mo. Const. art. I, sec. 19; *State v. Tolliver,* 839 S.W.2d 296, 299 (Mo. banc 1992). The federal protection, in the Fifth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" This provision applies to Missouri through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 787, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Kemper's claim therefore will

be analyzed under the double jeopardy provision of the United States Constitution.

Double jeopardy attaches when the jury is impaneled and sworn. *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 569, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). The parties do not dispute that jeopardy attached during Kemper's trial; the only issue is whether a second trial is barred. Once a trial has begun, the defendant has a right to have his trial completed by the jury that has been selected. *United States v. Jorn,* 400 U.S. 470, 484, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Oregon v. Kennedy,* 456 U.S. 667, 671–72, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Besides the right to have a particular jury hear the case, the right to be free from double jeopardy also protects the defendant from expense, stigma, emotional distress, and the increased risk that an innocent defendant will be found guilty. *Arizona v. Washington,* 434 U.S. 497, 503–04, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

Even though the defendant has an interest in preventing a mistrial, not all mistrials will result in barring a subsequent retrial. If the defendant requests or consents to a mistrial, double jeopardy will not bar reprosecution. *Jorn,* 400 U.S. at 485, 91 S.Ct. 547. The major exception is where the defense request was "motivated by governmental conduct which is 'intended to "goad" the defendant into moving for a mistrial.' " *State v.Fitzpatrick,* 676 S.W.2d 831, 835 (Mo. banc 1984) (quoting *Oregon v. Kennedy,* 456 U.S. at 676, 102 S.Ct. 2083); *Tolliver,* 839 S.W.2d at 299.

**Was there "manifest necessity" to grant a mistrial?**

Kemper neither requested nor consented to the mistrial. In fact, she objected strongly and offered a limiting instruction that would have instructed the jury about how to consider the polygraph evidence. Where the defendant opposes mistrial, double jeopardy will bar retrial unless there was "manifest necessity" for the mistrial. *Kennedy,* 456 U.S. at 672, 102 S.Ct. 2083; *Jorn,* 400 U.S. at 485, 91 S.Ct. 547; *Tolliver,* 839 S.W.2d at 299. Manifest necessity exists where "a 'scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.' " *Fitzpatrick,* 676 S.W.2d at 835. Determining whether manifest necessity exists is a case-specific inquiry. The words "manifest necessity" "do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." *Arizona v. Washington,* 434 U.S. at 506, 98 S.Ct. 824.

From the record it appears that the trial judge simply changed his mind. There was no new evidence or case law before the trial judge when he decided to grant the mistrial. In fact, the evidence presented was exactly that contemplated when the trial judge made his initial ruling that the evidence should be admitted. Although the state argues, and the trial court stated in its denial of the motion to dismiss, that the trial court's orders only allowed evidence that a polygraph was taken—not evidence of the results—this argument is contradicted by the record. After testimony by the state's witnesses, the trial court told Kemper that she could present evidence as to whether there were "signs of deception." The only way that Kemper could refute the detective's statement that Kemper had shown "signs of deception" on the polygraph was to introduce evidence that the results in fact did not show deception. This was the evidence that Kemper presented, and that evidence was proper in the limited circumstances of this case.

**52**

The issue that was crucial to the jury's understanding of the circumstances surrounding the confessions was the fact that police statements to Kemper about the results of the test were not true—not the fact that she took a test. Allowing only evidence that Kemper took the polygraph and that the detective said she failed it would have left the jury with the impression that she did indeed fail the test. The evidence admitted was exactly what would have reasonably been interpreted to result from the trial court's previous orders.

In these circumstances, a less drastic remedy than mistrial was available. The limiting instruction proposed by Kemper would have informed the jury that the polygraph results were not to be considered as proof of Kemper's guilt or innocence, but rather that they were to be used to evaluate the circumstances surrounding Kemper's confession. Considering all of the circumstances of this case, particularly the trial court's earlier ruling that the polygraph results were relevant in evaluating Kemper's confession, there was no manifest necessity requiring a mistrial. Because there was no manifest necessity, double jeopardy applies to bar re-trial.

This holding does not abrogate the general rule that polygraph evidence is inadmissible. In the limited circumstances presented here, however—where police first tell a suspect that she will pass the test if she tells the truth, then tell the suspect that she failed when the results do not support that conclusion, and these statements appear to be directly related to the suspect's confession—the confession may not be introduced into evidence without polygraph evidence also being admissible.

Kemper's re-trial for murder, arson, and assault would violate the double jeopardy provision of the United States Constitu-tion. The writ of prohibition is made absolute.

ALL CONCUR.