STATE of Missouri, Plaintiff–
Respondent,

v.

Valerie L. WATLING, Defendant–
Appellant.

No. 27383.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 18, 2007.

Ellen H. Flottman, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Presiding Judge.

Valerie L. Watling ("Appellant") was convicted of second-degree murder pursuant to § 565.021[1] and armed criminal action pursuant to § 571.015. She was found guilty in a jury-tried case and sentenced to a total of thirty-five years imprisonment for both offenses. Appellant alleges two errors on appeal and asks this Court to reverse her convictions and remand for a new trial. Finding no reversible error, we affirm.

### *Facts*

Springfield Police responded to a 911 call on the night of April 5, 2004, in which Appellant claimed she awoke to discover her husband had been shot in the bed next to her. The only people in the house when the officers arrived were Sean Watling ("Victim"), Appellant, and their two young children. Victim died of a gunshot wound to the head by the time he arrived at the hospital.

Detective Richard Counts interviewed Appellant three times at the police station after the incident. During the first inter-view, in the early morning hours of April 6, 2004, Appellant told Detective Counts that she awoke on the floor of her bedroom and found Victim wounded on the bed. During a second interview, later that day, Detective Counts told Appellant that the physical evidence collected at the scene did not match her explanation of the previous night's events. Appellant then told Detective Counts that after Victim confronted her about an affair he suspected Appellant was having, Victim told her he was going to shoot himself while wearing gloves so that he could pin it on her. Appellant claimed she was trying to get the gun away from Victim when it went off. Later, after Appellant detailed the events leading up to and immediately after the gun was fired, Detective Counts expressed skepticism at Appellant's new version of events which differed from the previous night's version. That prompted the following exchange:

[Detective Counts]: It makes [it] hard to believe what is the truth.

[Appellant]: I'll take a lie detector's test that he did it himself, and I apologize. I shouldn't have lied to you.

[Detective Counts]: Okay

[Appellant]: But I was very scared that I'd lose my . . .

[Detective Counts]: I appreciate you sayin' that you would take a lie detector test, but I'm going to also check all the physical evidence, okay?

. . . .

[Detective Counts]: You, you said earlier that you'd be willing to take a polygraph. Okay. And do you know what, I think you said polygraph, or did you say lie detector?

[Appellant]: Whatever it is. Polygraph, lie detector, whatever, to, you know.

. . . .

---

1. All references to statutes are to RSMo 2000, unless otherwise specified.

[Detective Counts]: And if you took that test, how do you think you would do on it?

[Appellant]: I think I would pass.

[Detective Counts]: Okay.

[Appellant]: You know, I mean.

[Detective Counts]: You think you would?

[Appellant]: I mean, I, I, I would pass. I mean, I'm not, I'm not lyin'. You know I have no reason. I, you know, I apologize. I'm sorry that I was dishonest with you earlier. I was scared, scared that, you know, I've never been in trouble before. If you look up my, you know, you pull my record up. I've never had anything more than two, maybe three ... traffic tickets my entire life. I'm 30, I'm almost 30 years old.

After this, Appellant elaborated more on the specific details before and after Victim's alleged suicide.

Detective Counts then interviewed Appellant's boyfriend, Dave Zauratsky. Mr. Zauratsky told Detective Counts that Appellant confessed to shooting Victim. When Detective Counts confronted Appellant with this information during the third interview, which occurred on April 7, 2004, Appellant said Mr. Zauratsky must have misunderstood her and then rambled on with a somewhat contradictory explanation of what happened the night of the shooting.

One example of the evolving nature of Appellant's story relates to a pair of gardening gloves the police discovered at the house. In the second interview, Appellant claimed Victim removed the gloves from her dresser drawer and put one of them on. In contrast, Appellant said during the third interview that she had the gloves out because she was repotting plants when the argument started and that she wore one of the gloves throughout the entire argument and that the other one was just lying on the bed. Appellant also claimed in the second interview that she tried to get out of the house during the fight. During the third interview, however, she said she could not run next door for help because Victim would "deprive [her] of [her] rights" if she left. Additionally, Appellant claimed in the third interview that during the argument Victim had her on the bed with the gun to her head, that he "had [her] up against the wall," made her sit in the rocking chair, and "had [her] in the bathroom," all details which she failed to share with Detective Counts in the second interview.

Appellant was charged with second-degree murder and armed criminal action. The jury returned a verdict of guilty on both counts. The court subsequently sentenced Appellant to a total of thirty-five years imprisonment for both offenses. This appeal follows.

### Point I

At the trial, the State sought to admit three videotapes of each of Appellant's interviews with Detective Counts. The State omitted the portion of the tape from the second interview in which Appellant offered to take a polygraph. Defense counsel argued that portion of the tape should be left in because it showed Detective Counts pressuring Appellant to make admissions. Over Appellant's objection, the judge ruled that the omitted portion of the tape was collateral and denied its inclusion in the exhibit.

In her first point, Appellant claims the trial court abused its discretion in admitting an edited version of the videotape of her second interview with Detective Counts which excluded her request to take a polygraph examination. Appellant argues that because the State introduced the

incriminating part of the interview, the "rule of completeness" entitled her to introduce the exculpatory portion of the interview. Appellant maintains that Detective Counts' assertions to her that she might not pass a polygraph were part of the interrogation technique that led to her incriminatory statements.

■ The trial court is vested with broad discretion to admit or exclude evidence. *State v. Simmons,* 944 S.W.2d 165, 178 (Mo. banc 1997). This Court will reverse only if the trial court abused that discretion. *Id.* This occurs when a ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration...." *State v. Brown,* 939 S.W.2d 882, 883 (Mo. banc 1997) (quoting *Shirrell v. Missouri Edison Co.,* 535 S.W.2d 446, 448 (Mo. banc 1976)).

■ As a preliminary matter, the results of a polygraph examination are generally inadmissible in criminal trials. *State v. Biddle,* 599 S.W.2d 182, 185 (Mo. banc 1980). The same is true of the accused's offer to take a polygraph examination. *State ex rel. Kemper v. Vincent,* 191 S.W.3d 45, 49 (Mo. banc 2006). The rationale for excluding such an offer is that it has no probative value in that the accused has nothing to lose by making the offer, because the results, if favorable or unfavorable, would be inadmissible against him. *State v. Bibee,* 496 S.W.2d 305, 316 (Mo.App.Spfld.D.1973). Such offers are merely self-serving acts or declarations, which are made without a possible risk. *Id.*[2]

■ Though inadmissible to prove Appellant's truthfulness, polygraph evidence may be considered under the "rule of completeness." *Kemper,* 191 S.W.3d at 49.

This rule allows a party to "introduce evidence of the circumstances of a writing, statement, conversation, or deposition so the jury can have a complete picture of the contested evidence introduced by the adversary." *Id.* at 49–50. Appellant relies on *Kemper* as authority for her claim of error in the refusal of the admission of polygraph evidence under the "rule of completeness."

*Kemper* does not assist Appellant. In *Kemper,* a detective told Ms. Kemper that if she was telling the truth, then she would pass the polygraph examination. *Id.* at 50. Ms. Kemper took the examination, and though she passed, the detective told her she failed and continued to interrogate her in order to obtain a confession. *Id.* The court determined the detective's untruthful statements about the results of the polygraph examination "appeared to be instrumental in causing Kemper to make the confessions that formed the basis of the state's case against her." *Id.* The court concluded "[i]t would be fundamentally unfair to allow those confessions into evidence without allowing Kemper to demonstrate the circumstances surrounding the confessions—namely, that police officers did not tell her the truth about whether she passed the polygraph examination." *Id.*

In contrast, Detective Counts told Appellant during her second interview that the police finished processing the scene and physical evidence contradicted her initial explanation of the previous night's events. When confronted with the contradictory physical evidence, Appellant then changed her story and said that in the course of trying to prevent Victim's suicide, she lunged for the gun and it "went off." Appellant continued to detail at

---

**2.** Appellant did not take a polygraph test at any time and the State did not mention the possibility of a test at any time during the trial.

length the events leading up to Victim's death and her actions immediately after the shooting.

It was only after Appellant's second rendition of the events that Detective Counts commented, "I'm a very skeptical person, okay? And especially when somebody tells me the story and lies to me several times and I catch them in lies, and then when I bring them back in here, then they come up with another story." In what was an obvious attempt to persuade Detective Counts of her truthfulness, Appellant offered to submit to a polygraph examination and apologized for lying. No significant new admissions followed Appellant's offer to take the polygraph. Appellant told the same story at trial that she gave to Detective Counts during the second interview and prior to her offer to take a polygraph.[3]

In contrast to Appellant's contention, the discussion of the polygraph examination did not cause Appellant to confess to her involvement in Victim's death. As the trial court aptly noted, the discussion of the polygraph examination was collateral to the confession. The jury did not need the evidence of an offer by Appellant to take a polygraph test for a complete picture of any contested evidence. As such, it was not admissible under the "rule of completeness" and the trial court did not abuse its discretion in excluding it from the jury. Point I is denied.

### Point II

Officer Ryan Holstein, one of the responding officers on the night of April 4, 2004, testified at trial. Officer Holstein explained to the jury why he handcuffed Appellant when he arrived on the scene that night,

In a situation like this, we don't know who the suspect is, like I said, and we have to take everybody as—until we know. A lot of my reasoning behind placing her in handcuffs is based off of her actions. You can tell the way a suspect acts sometimes compared to a victim based off their—how calm they are or if they're crying. There's just a ton of factors that are involved.

The prosecutor asked Officer Holstein whether, during the course of his law enforcement career, he had made any general observations on the behavior of the victims' family members at the more than twenty fatality scenes he has worked. Over Appellant's objection of relevance, Officer Holstein responded,

A lot of times, anytime I go to a death call, any type of a—what we call "J4" is a death. Anytime we go to a call like that, I've noticed a lot of the family members to be upset. Times—there's times where they'll scream and you have to hold them back from hurting any evidence that's in the crime scene or the scene at all. Normally, it's a very—hostile would be the—it seems like they are upset, they're crying, they're screaming, that type of thing because they can't believe what has happened.

. . . .

A lot of times if it's a dirty scene of if there's blood involved or things like that, you always notice it on their clothes, on their hands, because they're trying to revive the person that has died.

Officer Holstein said that he did not see any blood on Appellant the night of the shooting.

Appellant asserts in her second point that the trial court erred in admit-

---

**3.** Appellant does not contend in her appeal that her third version of the facts was caused by the discussion of the polygraph.

ting Officer Holstein's testimony because the State failed to lay the foundation for his expertise on the typical behavior of the family members of victims at a fatality scene. We note at trial Appellant objected on the ground of relevance to Officer Holstein's testimony, but on appeal, Appellant claims that the State failed to lay a foundation for Officer Holstein's testimony. The failure to lay an adequate foundation for the testimony of an expert witness can easily be remedied by the trial court if a timely objection is raised. *See State v. Barnett,* 980 S.W.2d 297, 304–05 (Mo. banc 1998) (noting that a timely objection to the alleged error gives the trial court an opportunity to invoke corrective measures instead of relegating appellate courts to the imprecise determination of whether prejudice resulted to appellate courts). Because Appellant failed to preserve her foundation objection to Officer Holstein's testimony at trial, we review for plain error. *State v. Butler,* 24 S.W.3d 21, 25–26 (Mo.App. W.D.2000) (declining to review a claim of inadequate foundation raised for the first time on appeal).

■ Plain error review should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review. *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc 1990), *abrogated on other grounds by Morgan v. Illinois,* 504 U.S. 719, 725 n. 4, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). This Court may review for errors affecting substantial rights when we find "that manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20.[4] We look for errors which are evident, obvious, and clear. *State v. Hibler,* 21 S.W.3d 87, 96 (Mo.App. W.D.2000). We find none here.

■ To lay a proper foundation for the testimony of an expert witness, the proponent must show that the witness has sufficient expertise and acquaintance with the incident involved to testify as an expert. *State v. Watt,* 884 S.W.2d 413, 415 (Mo. App. E.D.1994). At trial, the State established that in the almost four years Officer Holstein worked with the Springfield Police Department, he has worked over twenty cases involving fatalities. Officer Holstein explained that at these scenes, "a lot of the family members [are] upset ... there's times where they'll scream and you have to hold them back from hurting any evidence." The jury was also told that "[a] lot of times if it's a dirty scene or if there's blood involved or things like that, you always notice it on their clothes, on their hands, because they're trying to revive the person that has died." Based upon this experience and Appellant's calm demeanor and clean appearance the night of Victim's shooting, Officer Holstein decided to handcuff Appellant, thinking she might be a suspect. We find no error, plain or otherwise, in the trial court's admission of Officer Holstein's testimony. Point II is denied.

Accordingly, the judgment is affirmed.

PARRISH, J., and SCOTT, J., concur.

4. All rule references are to Missouri Court Rules (2006), unless otherwise specified.