Colleen Dolan, Presiding Judge
On the Court's own motion, the opinion filed in this case on January 30, 2018 is hereby withdrawn and a new opinion is to issue. Respondent's motion to modify and application for transfer to the Missouri Supreme Court are denied as moot.
SO ORDERED.
Lisa Van Amburg, Judge
Johnetta Salmon appeals the trial court's judgment after a jury convicted her of endangering the welfare of a child in the first degree. We reverse and remand for a new trial.
Factual Background
Appellant Johnetta Salmon ("Salmon") was charged with one count of endangering the welfare of a child and one count of neglect of a child, or in the alternative, abuse of a child. Salmon was charged with endangering the welfare of her infant son "Baby M." on or between February 26 and May 30, 2014 by failing to provide Baby M. with adequate nutrition. She was also charged with neglecting or abusing Baby M. in relation to a broken arm he sustained on or between May 1 and May 30, 2014, a charge of which the jury found her not guilty.
Baby M. was born to Salmon and Monte Ashcraft ("Ashcraft") on February 26, 2014, Salmon was 18 years old when she delivered Baby M., her first child. Salmon took Baby M. to the pediatrician at least seven times between February 27 and May 13, 2014. Although Baby M. showed appropriate weight gain at two of these visits, Baby M.'s pediatrician discussed with Salmon proper feeding techniques during four visits, due to Baby M.'s poor weight gain, or weight loss.
On May 30, 2014, Salmon and Ashcraft took Baby M. to the Mexico Audrain Medical Center emergency room. Hospital personnel found that Baby M. had a broken arm and transferred him to the Women's and Children's Hospital in Columbia due to suspected child abuse. There, doctors also found rib fractures and determined that the arm and rib fractures were consistent with abuse. In addition, personnel at the Women's and Children's hospital noted that Baby M. was severely underweight, lacked appropriate muscle tone, and showed developmental delay for a baby of his age, length, and head circumference. Because Baby M. did not exhibit any conditions that might prevent him from gaining weight or absorbing calories, and regular feedings at the hospital resulted in weight gain, doctors concluded that Baby M.'s malnourishment was the result of being inadequately fed. Additional facts relevant to the points on appeal appear below.
*730 Procedural Background
Salmon and Ashcraft were charged in separate indictments. Salmon's case was initially set for trial on January 21, 2015. Her case was continued several times during 2015, before the prosecution filed a Motion for Joinder in February 2016. The trial court granted the motion, entering an order to consolidate for jury trial purposes, and setting the trial date for June 22, 2016. Later, Ashcraft and the State agreed to try the case against Ashcraft on May 16, rather than the initial setting of June 22. When Salmon's defense counsel learned of the change to Ashcraft's trial date, he informed the court and prosecutor that he would not be ready to proceed to trial on Salmon's case in May. Defense counsel asked whether Ashcraft's trial date change would affect Salmon's trial date, and requested that Salmon's trial remain set for June 22. The court and State agreed that only Ashcraft would be tried in May, and Salmon's trial date would remain June 22, Ashcraft's trial proceeded in May, and a jury found him guilty of endangering the welfare of a child and abuse of a child. Following Ashcraft's guilty verdict, Salmon filed a motion to dismiss, alleging double jeopardy from a failure to properly sever the cases of Ashcraft and Salmon. The motion was denied.
Before her trial, Salmon filed a motion to disqualify Assistant Prosecuting Attorney Andrew Rehmer ("APA Rehmer") for conflict of interest due to his positions as both the prosecuting attorney in the present case and counsel for the circuit juvenile office in a separate action to terminate Salmon's parental rights to Baby M. The motion to disqualify was denied.
Before trial, Salmon filed a motion in limine to exclude evidence of Ashcraft's guilty verdicts. At trial, during examination of an expert witness, Dr. Beal, the State sought to admit an audio police interview with Ashcraft, Dr. Beal testified to the bone fractures Baby M. sustained. Salmon objected to the admission of the police interview of Ashcraft on the grounds that it was not relevant. The trial court allowed admission of both Ashcraft's guilty verdicts and police interview.
Before trial, Salmon filed a motion in limine to preclude evidence of prior bad acts. The trial court ruled that Salmon's prior bad acts could only be used for impeachment. During the cross-examination of Salmon's half-brother Mr. Hooker, APA Rehmer raised the subject of Salmon's prior bad acts and of Salmon's juvenile court record. Salmon had not elicited evidence of her good character from the witness, nor is there any indication in the record that APA Rehmer notified the court or opposing counsel of his intent to use Salmon's confidential juvenile record in his cross-examination. The trial court sustained Salmon's objection to the question about her uncharged acts as a juvenile, and denied Salmon's motion for a mistrial at the end of the cross-examination.
Before trial, Salmon's counsel orally moved in limine to preclude the State from demonstrating the filling of baby bottles throughout the trial. The trial court ruled that it would allow such a demonstration if proper foundation was laid. The State failed to lay a proper foundation for the demonstrations or make note of the demonstrations on the record. In the State's closing argument, however, APA Rehmer asserted that he did fill baby bottles throughout the trial.
The jury found Salmon guilty of endangering the welfare of a child in the first degree, and not guilty of abuse or neglect of a child. She was sentenced to three years' imprisonment. This appeal follows.
Analysis
Point I concerns sufficiency of the evidence, which we find in favor of the State.
*731 Point VI, however, is determinative of the disposition of this appeal, and on this point we reverse and remand for a new trial. For ease of analysis, we address Point VI first.
Introduction of Prior Bad Acts and Juvenile Record (Point VI)
For her sixth point, Salmon argues that the trial court erred in denying her motion for a mistrial after the State disclosed information about prior bad acts and her juvenile record during its cross-examination of Mr. Hooker, Salmon's half-brother who was granted custody of Salmon at age 14.
Mr. Hooker testified for the defense that, during the first three months of Baby M.'s life, he observed Baby M. with Salmon about every other day. Mr. Hooker testified that "it seemed like the baby always had a bottle in his mouth," and that he never saw anything that indicated that Baby M. was being abused by either Salmon or Ashcraft, Then, during APA Rehmer's cross-examination, the following exchange occurred:
Q [APA Rehmer]: And do you think she did this?
A [Mr. Hooker]: I do not.
Q: Do you think she's the type of person that would do that?
A: No.
Q: Would it change your opinion to know that she assaulted two people last week?
Defense counsel objected and a bench conference took place:
Defense Counsel: That's not even a prior conviction. That's a pending case and that's going to the character of violence.
APA Rehmer: He said she'd never do it.
Defense Counsel: He didn't say never do it.
APA Rehmer: No, he said-
The Court: He said-
Defense Counsel: To your question ... You can't open the door for yourself.
The court overruled the objection and APA Rehmer's cross-examination of Mr. Hooker continued:
Q: Would it change your opinion of that?
A: What's that?
Q: Her assaulting two of her family members last week. Would it change your opinion of whether she could hurt Baby M. or not?
A: [I]s self-defense considered assaulting two other people?
Q: Okay. And you know what her prior juvenile was, record was for; right?
A: I do.
Q: And her shanking somebody, would that change your opinion on whether she could hurt this kid?
Defense Counsel: Objection. Uncharged bad acts.
The Court: Sustained. Let's move on.
Following this exchange, APA Rehmer asked Mr. Hooker four more short questions to finish his cross-examination. Immediately thereafter defense counsel moved for a mistrial and the court denied the motion, without explanation:
Defense Counsel: Judge, we move for a mistrial.
The Court: Okay. Overruled.
At the request of defense counsel, prior to giving the jury instructions, the court told the jury to "disregard any mention of the fact that the defendant had committed any violence as a juvenile."
As an initial matter, we consider whether this issue was properly preserved for appeal. "The general rule with respect to preservation of error is that an objection *732 stating the grounds must be made at trial, the same objection must be set out in the motion for new trial and must be carried forward in the appeal brief to preserve it." State v. Jackson , 948 S.W.2d 138, 141 (Mo. App. E.D. 1997). Salmon clearly raised the issue in her motion for a new trial and in her appellate brief. The only question is whether she adequately objected at trial. The State argues that at trial, Salmon did not adequately object. We find that she did.
Preservation of error for appellate review requires that an objection be timely made, usually at the earliest possible opportunity, so that the trial court may have an opportunity to correct the alleged error. State v. Downing , 359 S.W.3d 69, 73 (Mo. App. W.D. 2011). This case is analogous to State v. Davis , 122 S.W.3d 690 (Mo. App. E.D. 2003), in which a mistrial question was preserved despite a small lapse of time between the objection and the request for a mistrial. In Davis , the State made an improper remark in its closing argument. Defendant objected immediately after the remark and then requested a mistrial immediately after the end of the State's argument. Id. at 692. This court deemed the issue preserved, reasoning that the "trial court was properly aware at the appropriate time what defendant's objection was." Id.
As in Davis, here Salmon objected immediately after the question-the only objection that was sustained during that cross-examination-and requested a mistrial immediately after the cross-examination. Under these circumstances, we conclude that the trial court knew that the request for the mistrial stemmed from the State's questions concerning Salmon's past acts and juvenile history. We deem the matter preserved.
Proceeding to the merits, Salmon asserts that the trial court erred in failing to grant her request for a mistrial after the State introduced, in cross-examination of a defense witness, the existence of a prior bad act and Salmon's juvenile record, including the allegation that she "shanked," or stabbed, someone. A mistrial is a drastic remedy to be used only in the most extraordinary circumstances when there is a grievous error which cannot otherwise be remedied. Id. A trial court's decision regarding a mistrial will not be disturbed on appeal absent an abuse of discretion. State ex rel. Kemper v. Vincent , 191 S.W.3d 45, 49 (Mo. banc 2006). "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id. (internal citations omitted). In order to hold that a failure to grant mistrial was a reversible error, we must conclude as a matter of law that the error was so prejudicial that its effect was not removed by action of the trial court. State v. Shelton , 779 S.W.2d 614, 616 (Mo. App. E.D. 1989). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." State v. Kemp , 212 S.W.3d 135, 145-46 (Mo. banc 2007). Here, the trial court's failure to declare a mistrial had a prejudicial effect that could not be removed by the trial court's instruction to the jury to "disregard any mention of the fact that the defendant had committed any violence as a juvenile."
The confidentiality of juvenile records in Missouri is strongly protected by the legislature and judiciary. The overall purpose of the juvenile code, Chapter 211, is to protect and safeguard the best interests of the juvenile. State ex rel. Rowland v. O'Toole , 884 S.W.2d 100, 103 (Mo. App. E.D. 1994). While Section 211.321 *733 provides that juvenile records are generally confidential, Section 211.271.3 provides:
[A]ll admissions, confessions, and statements by [a child in state custody] to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter.
The prohibition on use of juvenile records as evidence set out in Section 211.271.3 is "mandatory" and "all-inclusive." State v. Richardson , 923 S.W.2d 301, 311 (Mo. banc 1996) (quoting State v. Miner , 657 S.W.2d 332, 333 (Mo. App. E.D. 1983) ). "There is no good reason why any reference should be made to prior juvenile court proceedings, absent some exceptional circumstances, in a criminal trial." State v. Ford , 487 S.W.2d 1, 5 (Mo. 1972).[1] APA Rehmer clearly violated Section 211.271.3 by asking Mr. Hooker about Salmon's juvenile record.
Moreover, APA Rehmer's questions regarding Salmon's prior and/or uncharged acts were improper and irrelevant:
Evidence of prior bad acts or uncharged criminal acts is justified when it is offered for purposes other than to establish the defendant's propensities to commit the crime with which he is charged. These purposes include establishing motive, intent, absence of mistake or accident, identity, or a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other.
State v. Batiste , 264 S.W.3d 648, 651 (Mo. App. W.D. 2008). In Batiste , evidence of prior incidents of abuse of a child were inadmissible to prove another incident of abuse of the same child. It clearly follows that allegations or evidence of Salmon's prior assaults of adults were not admissible to prove her abuse of Baby M.
One exception to the general rule regarding admissibility of prior bad acts is the curative admissibility doctrine, otherwise known as "opening the door." The curative admissibility doctrine says that after one party introduces inadmissible evidence, the opposing party may introduce otherwise inadmissible evidence of its own to rebut or explain inferences raised by the first party's evidence. State v. Middleton , 998 S.W.2d 520, 528 (Mo. banc 1999). Here, the witness responded to the State's question about whether she was the "type of person that would do that," The State, not the defense, elicited the opinion testimony about Salmon's character from Mr. Hooker. See State v. Hemby, 63 S.W.3d 265, 269 (Mo. App. S.D. 2001) (Response by State's witness to defense's question on cross-examination did not "open the door" for defendant). Therefore, the State could *734 not introduce inadmissible prior bad acts to rebut its own evidence.
APA Rehmer's improper questions prejudiced Salmon such that the prejudice could not be removed absent mistrial. "Though the scope and extent of cross-examination in criminal cases rests largely in the discretion of the trial judge, evidence of other crimes, if erroneously admitted, is presumed to be prejudicial." State v. White , 230 S.W.3d 375, 379 (Mo. App. S.D. 2007). If counsel intentionally injects an evidentiary error into a trial, the trial court may grant a mistrial, State v. Blurton , 484 S.W.3d 758, 779 (Mo. banc 2016). Here, information regarding Salmon's juvenile record and prior bad acts was not errantly offered by a witness or subject to inadvertent disclosure; APA Rehmer purposefully phrased his question to include the inadmissible information. The juvenile code serves to hold the records of juvenile proceedings inviolate. State ex rel. S.M.H. v. Goldman , 140 S.W.3d 280, 283 (Mo. App. E.D. 2004). As such, intentional introduction of juvenile records by counsel subverts clear Missouri law. Moreover, APA Rehmer's questions were not just generic mentions of prior bad acts, rather, they were peppered with inflammatory references, such as assaulting "family members" "a week ago," and a "shank[ing]." The term "shanked" alone conjures up images of a violent stabbing with a crudely fashioned knife.[2] Paired with the reference to her juvenile record as well as a reference to an alleged recent assault, a juror might readily infer that Salmon is a violent person who could be capable of inflicting violence upon or neglecting her child.
Finally, we find that the trial court abused its discretion by denying Salmon's request for a mistrial, and that this error prejudiced Salmon. "Error that may be disregarded as harmless where the evidence of guilt is strong may require reversal in a close case." State v. McClendon , 895 S.W.2d 249, 252 (Mo. App. E.D. 1995). Although we find that the evidence in this case was sufficient to support a guilty verdict (see Point I infra ,) the evidence of guilt was not so overwhelming as to render APA Rehmer's improper questions harmless. This was a close case where the guilty verdict rests on inferences that Salmon knowingly endangered Baby M.'s health by underfeeding him, even though she exhibited care for Baby M.'s health by regularly taking him to the pediatrician, and even though the pediatrician never told her that Baby M.'s low weight was perilous. The evidence may have been sufficient to convict Salmon, but given that the evidence of her guilt was not overwhelming, we find a reasonable probability that APA Rehmer's improper questions affected the outcome of the trial. Therefore, the trial court abused its discretion in denying Salmon's request for a mistrial based on APA Rehmer's introduction of her confidential juvenile record and prior bad acts.
Accordingly, we reverse and remand for a new trial on Point VI.
Disqualification of APA Rehmer (Point V)
Salmon claims in her Point V that the trial court erred in overruling her motion to disqualify APA Rehmer due to an alleged conflict of interest stemming from APA Rehmer's legal representation of the juvenile office in the same judicial circuit as the trial court. The State describes APA
*735 Rehmer as "representing the Juvenile Office in litigation seeking to terminate [Salmon]'s parental rights to [Baby M.]"
Because we are reversing and remanding on Point VI, we need not rule on the propriety in general of an attorney serving concurrently as both prosecutor in an individual's criminal cause and counsel for the juvenile office in a cause for the termination of that same individual's parental rights. However, we note that in any case in which an attorney plays such dual-roles, the attorney/prosecutor has full access to the privileged juvenile records of the parent/defendant, if they exist. This information should not be abused.
As this situation will not recur on remand,[3] we need not address it further.
Sufficiency of the Evidence (Point I)
For her first point, Salmon contends that the trial court erred in overruling her motion for acquittal because the evidence was insufficient for a reasonable juror to find that Salmon "knowingly" acted in a manner that created "a substantial risk to the life, body, or health of a child" as required by § 568.045. Specifically, Salmon argues that she did not have knowledge of any substantial risk to Baby M. from malnourishment because the pediatrician never alerted her that Baby M. was at risk.
In reviewing sufficiency of the evidence in a jury-tried case, we do not act as a super juror with veto powers, but give great deference to the jury. State v. Bateman , 318 S.W.3d 681, 687 (Mo. banc 2010). Our review is limited to "whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of guilt beyond a reasonable doubt." Id. The question is not whether the evidence established guilt beyond a reasonable doubt, but instead, whether any rational juror could have found the elements of the crime beyond a reasonable doubt. Id. We must accept as true all evidence and inferences favorable to the State and disregard evidence to the contrary, Id., however, we "may not supply missing evidence or give the State the benefit of unreasonable, speculative, or forced inferences," State v. Gilmore , 537 S.W.3d 342, 344, 2018 WL 414949 at *2 (Mo. banc 2018).
"There is no bright line test to determine whether or not a person's actions knowingly create a substantial risk to the health of a child." State v. Davis , 407 S.W.3d 721, 724 (Mo. App. S.D. 2013). "The State may prove a defendant's knowledge by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." Id. Direct proof of the mens rea is seldom available and such intent is usually inferred from circumstantial evidence. Id. In determining whether a person knowingly created a substantial risk, we look to the totality of the circumstances. Id.
Mindful of these standards, we note the following evidence. At trial, the State offered the testimony of Dr. Beal as an expert in pediatrics and as a forensic physician who had reviewed Baby M.'s medical history. Dr. Beal testified that, when Baby M. was admitted to the hospital on May 30, he was "probably the skinniest baby or the most malnourished baby in a population of one hundred at that age," and that Baby M. "had a significant failure to thrive, [he was] basically very malnourished, very underweight." Dr. Beal reviewed a photo of Baby M. from May 30, and noted that Baby M. had virtually no subcutaneous fat. He testified that almost all of Baby M.'s ribs were visible, his thighs were very thin, his breast bone and *736 xiphoid were visible, and his eyes were sunken in. Dr. Beal testified that a three-month-old baby should have "thundering thighs" and should appear chunky or roly-poly. Dr. Vietti, who examined Baby M. on May 30 and subsequently fed Baby M. during his hospital stay, testified that Baby M. was hypotonic, meaning he had low muscle tone.
Although no evidence showed that Baby M.'s pediatrician ever explicitly told Salmon that Baby M. was malnourished, he did counsel her at least four times about proper feeding techniques due to Baby M.'s failure to gain a satisfactory amount of weight. At trial, Salmon maintained that she fed Baby M. two scoops of formula in five ounces of water every three hours. Salmon testified that Baby M. never missed one of these feedings, and that he consumed most of the bottle at each feeding. However, evidence showed that Baby M. weighed 10 pounds on May 13, at his last visit to the pediatrician before being hospitalized, and that upon admission to the hospital 17 days later, he weighed just 10.03 pounds. Several physicians testified that at Baby M.'s age, a baby should gain 0.5 to 1 ounce per day. Further, Dr. Vietti testified to Baby M.'s weight gain while he was in the hospital from May 30 to June 4. During that time, Dr. Vietti testified that Baby M. was fed up to five ounces of formula every three to four hours. In less than a week Baby M. gained more than one pound, which Dr. Vietti testified, is equivalent 10 to 20 days' worth of weight gain for a normal baby. Dr. Vietti testified that Salmon's claim of feeding Baby M. five ounces every three hours could not be true, because "when we fed him less than [what Salmon claimed to feed Baby M.,] he gained more weight than he was gaining prior to hospitalization."
Viewing the entire record in the light most favorable to the State, and accepting all reasonable inferences, a juror believing the foregoing evidence could reasonably find that Salmon knew that she was risking the life, body or health of Baby M. by not providing him with adequate nutrition. Our Supreme Court held that a jury could disbelieve a defendant's explanation of his conduct and reasonably infer guilt based on the fabrication. State v. Perry , 275 S.W.3d 237, 249 (Mo. banc 2009). Here, the jury could believe Dr. Vietti's testimony about Baby M.'s significant weight gain in 5-6 days in the hospital over Salmon's own testimony that she fed Baby M. every three hours, especially considering that Baby M. gained almost no weight in the previous 17 days with Salmon. Believing Salmon's story to be false, the jury could infer Salmon's guilt, including her state of mind. Therefore, Point I must be denied.
Double Jeopardy Claim (Point VII)
For her Seventh Point, Salmon claims that the trial court erred in denying her motion to dismiss for double jeopardy. Salmon claims that, because the court consolidated her case and Ashcraft's case for trial and the cases were not properly severed, the State abandoned their charges against her when they tried Ashcraft on May 16-17, 2016 but failed to request jury instructions on her counts of child endangerment and abuse or neglect. Salmon claims that this "abandonment" resulted in acquittal on her charges.[4] We find that the court, at Salmon's invitation, properly and effectively severed Ashcraft's and Salmon's trials.
*737 Salmon and Ashcraft were charged in separate indictments. Although their trials were at first set separately, the prosecution filed a Motion for Joinder in February 2016. The court entered an order to consolidate the cases for jury trial purposes, and set a trial date of June 22, 2016. Prior to trial, Ashcraft and the State agreed to try the case against Ashcraft on May 16, rather than June 22. When Salmon's defense counsel learned of the change to Ashcraft's trial date, he informed the court and prosecutor that he would not be ready to proceed to trial in May. In an email to the trial court and one of the assistant prosecuting attorneys assigned to Salmon's case, defense counsel wrote:
I would file a motion for continuance, but as of right now Ms. Salmon's case is still set for the date that I want. I am just trying to clarify whether the entry in Mr. Ashcraft's case affects the trial date in Ms. Salmon's case. If so, I would ask that the trial date in Ms. Salmon's case remain June 22-23 as currently set.
In response, the court and prosecution agreed that only Ashcraft would be tried on May 16 and that Salmon's case would remain set for June 22, effectively severing the trials. Nonetheless, Salmon filed a pretrial motion to dismiss on double jeopardy grounds. At the hearing on that motion, the trial court told defense counsel:
You know, you requested ... to not try her case with his. It was your specific request. And at your request we reset it for June 22nd.[5] ... And I'm gonna deny the motion because I think that it's clear that we were not going to be trying the two cases together at your request because you did not and could not be ready at that time and wanted to try it separately.
"[I]t is well understood that parties should not charge error they invited, or complain that a court did what they asked ..." State v. Henderson , 468 S.W.3d 422, 425 (Mo. App. S.D. 2015). It is clear from the record that Salmon invited a trial separate from Ashcraft. Salmon's counsel told the court he could not be ready to try Salmon's case with Ashcraft in May, and did not object to Ashcraft being tried in May. "No criminal trial or judgment should be affected, in any manner, by an error committed at the instance of the defendant." Johnson v. State , 477 S.W.3d 2, 8 (Mo. App. E.D. 2015).
We nonetheless address Salmon's claim that Section 545.880.2 requires the trial court to effectuate "proper severance" of a joint trial, and that here, the absence of "proper severance" requires us to find that the State abandoned its charges against Salmon, which, she contends, resulted in her acquittal at the end of Ashcraft's trial. First, we note that Rule 24.06(a) governs defendants charged in different indictments: "If two or more defendants could have been joined in the same indictment or information but they are charged in separate indictments or informations, the court may order the defendants to be tried jointly upon motion of any party." Nothing in Rule 24.06(a) restricts the severance of defendants who were not charged in the same indictment. Moreover, Section 545.880.2, the corresponding statute to Rule 24.06, states that "the court shall order the severance of defendants for trial" only "[i]f, upon written motion of the defendant, the court finds that the probability for prejudice exists in a joint trial." Here, there was neither written motion for severance by the defendant nor any claims *738 of prejudice from a joint trial, and Salmon fails to provide any other authority for the proposition that "proper severance" is required to effectively sever a trial. Salmon's trial was effectively severed from Ashcraft's, therefore there is no double jeopardy here.
Point VII is denied.
Prosecutor's demonstrative evidence (Point IV)
For her fourth point, Salmon asserts that APA Rehmer's statements to the jury during closing argument that he "fed" an imaginary "Baby M." at three-hour intervals throughout the trial amounted to "improper unsworn testimony" and that the trial court erred in not declaring a mistrial sua sponte. Because we remand for a new trial, we need not and do not reach this point. Nevertheless, we provide guidance regarding the problematic demonstration by APA Rehmer.
Before trial, Salmon's counsel made an oral motion in limine, stating:
I want ... the Court to preclude the State from doing a demonstrative evidence throughout this trial of filling bottles. The State, the prosecutors, they're not witnesses. What they do is not evidence. And then at the end of the [Ashcraft's] trial they argued about what they were doing and that was facts not in evidence. I mean demonstratives have to come through witnesses. [APA] Rehmer or I can't just in between witnesses get up and act something out in front of the jury and that's what this is, but it's just little pieces throughout the whole trial.
The State replied that "It's just demonstrative evidence, Judge" and asserted that it would lay foundation from witnesses regarding how often and how much Baby M. was to be fed. The court said he would allow the demonstration provided the State laid a proper foundation. During his examination of his first witness, Detective Jay Thompson, APA Rehmer introduced into evidence a can of baby formula followed by this exchange:
Q [APA Rehmer]: And I have these bottles over here. Are these baby bottles?
A [Detective Thompson]: Yes, sir.
Q: And how much did [Salmon] tell us was in a bottle that he fed?
A: Uh, she stated five ounces and two scoops.
Q: And did she tell how often she fed Baby M.?
A: Every three hours.
Q: So if we started this trial at nine o'clock in morning, a bottle at nine, a bottle at noon, we should have two bottles prepared?
A: Correct.
Q: Okay. Go ahead and do that.
THE COURT: Be careful with the water. Why don't you do it at your desk.
Q: Sorry, Judge.
There is no mention of what physical actions were then performed by APA Rehmer or any other person.[6] Although APA Rehmer laid a foundation for the amount of formula and frequency of the feedings from Det. Thompson, the State notes nothing on the record about any measurements, mixing, or other actions being performed with respect to the bottles. There *739 is no record of counsel noting that he is filling bottles, measuring formula, or performing any other actions. In fact, the trial transcript reflects no other mention of the State's purported bottle preparations/feedings until APA Rehmer's closing argument:
And going back to how much we know she fed them she told us. We fed him every three hours, four to five ounces in a bottle, two scoops of Enfamil. And I don't know if you guys noticed, but I've been feeding my Baby M[.] every three hours. I've done it on the hour every three hours while we've been doing this. Even though I had other things going my baby got fed.
This court is bound by the record on appeal and cannot speculate as to what evidence may have been presented below which is not reflected by the record. State v. Interest of S.A.N. , 158 S.W.3d 863, 866 (Mo. App. W.D. 2005). Here, the record is silent as to what, if anything, happened with the baby bottles and formula. Although APA Rehmer told the jury he had been filling a bottle every three hours, he failed to note on the record that he was performing those fillings, preserving nothing for review.
Even if the record sufficiently captured the "bottle feedings" referenced by the State in. its closing argument, such a demonstration, nonetheless, would amount to improper testimony by the prosecutor, an unsworn witness.
The right of a prosecuting attorney to testify in a criminal case is strictly limited to those instances where his testimony is made necessary by the peculiar and unusual circumstances of the case. Even then, his functions as a prosecuting attorney and as a witness should be disassociated.
Nunn v. State , 778 S.W.2d 707, 710 (Mo. App. E.D. 1989) (citing State v. Hayes , 473 S.W.2d 688 (Mo.1971) ). APA Rehmer argues, in closing argument, that he was filling bottles throughout the trial. By performing the demonstrations himself, APA Rehmer became a witness as well as a prosecutor. This is problematic in part because "a lawyer who assumes both of those roles in a single case makes it more difficult for opposing counsel to conduct effective cross-examination and creates an awkward scenario in which one advocate must challenge the credibility of his legal adversary" and because "the lawyer who assumes the role of a witness must argue his own credibility, which may serve to weaken his credibility and effectiveness as an advocate." Id. (quoting State v. Johnson , 702 S.W.2d 65, 69 (Mo. banc 1985) ). Here, the issue of Salmon's ability to cross-examine APA Rehmer about any demonstration would be hindered by the apparent sporadic and unrecorded nature of the actions "on the hour" throughout the trial. Moreover, the role of advocate and witness "are said to be simply inconsistent." Id.
Additionally, we note the inherent problems with the demonstration proposed by APA Rehmer. In assessing the relevance of demonstrative evidence, a trial court must ensure that the evidence fairly represents what is being demonstrated and that it is not inflammatory, deceptive or misleading. Johnson v. State , 406 S.W.3d 892, 902 (Mo. banc 2013). Without having any record of what was actually demonstrated by the State, we cannot determine whether the demonstration fairly represented feeding a baby, however, we find it unlikely. Babies are, by nature, highly unpredictable. Any number of variables might influence feeding time. A baby will not necessarily eat simply because an adult fills a bottle "on the hour every three hours." Here, the State laid no foundation to show that such a demonstration was a fair representation of proper feeding schedule for Baby M., and we sincerely doubt the feasibility of a fair demonstration of this nature in a courtroom. The *740 trial court may address this issue, if it arises again, on remand.
Issues not reached (Points II and III)
As a result of reversal and remand on Point VI, we need not reach Salmon's remaining Points II and III relating to the admission of Ashcraft's police interview and the admission of Ashcraft's guilty verdict, respectively. The trial court will have an opportunity to address these issues should they arise on remand.
Conclusion
The trial court's judgment is reversed and remanded for a new trial.[7]
Colleen Dolan, P.J.
Mary K. Hoff, J., concur.

We note that the Missouri Supreme Court, in State v. Prince , 534 S.W.3d 813 (Mo. banc 2017), recently held that defendant's juvenile records from Idaho regarding lewd and lascivious conduct with his six-year-old niece were admissible in his trial for forcible sodomy, child abuse, and murder of a four-month-old girl. The sexual nature of the crimes in Prince distinguishes it from the instant case. Article 1, section 18(c) of the Missouri Constitution provides "for crimes of a sexual nature involving a victim under eighteen years of age , relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of ... demonstrating the defendant's propensity to commit the crime ... presently charged." (Emphasis added). Salmon is not charged with a crime of a sexual nature involving a child, so her juvenile record is not admissible under Article I, section 18(c).

For examples of "shanks," see State v. Greer , 348 S.W.3d 149, 152-53 (Mo. App. E.D. 2011) ; State v. Blackmon , 421 S.W.3d 473, 475 (Mo. App. S.D. 2013) ; Tisius v. State , 519 S.W.3d 413, 422-23 (Mo. banc 2017).

The court is advised that Mr. Rehmer is no longer employed in the prosecutor's office.

For her proposition, Salmon cites cases in which multiple counts were brought against a defendant, and the State requested jury instructions for some, but not all, counts. In those cases, the counts for which no instructions were offered were abandoned and jeopardy attached. This case is not analogous.

In fact, it was Ashcraft's trial that was reset from June 22 to May 16. Salmon's trial date remained the same.

The State asserts that the prosecutor's statement of "Go ahead and do that" to the witness shows that the prosecutor himself did not fill the bottles, thereby bypassing the issue of the prosecutor offering unsworn testimony. This assertion is at odds with the court's request to "do it at your desk" and the prosecutor's statement in closing that "I've been feeding my Baby M every three hours," where both imply the prosecutor himself did the "feedings."

Where a conviction is reversed for trial error concerning the improper admission of evidence rather than for insufficiency of the evidence, the proper remedy is to reverse and remand for a new trial. State v. Taber, 73 S.W.3d 699, 707 (Mo. App. W.D. 2002), citing State v. Wood , 596 S.W.2d 394 (Mo. banc 1980). On remand, the State can either choose not to re-try the case or proceed to trial without the inadmissible evidence. Id.