

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| TIMOTHY S. KELLEY, | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD83185 |
| | ) | |
| STATE OF MISSOURI, | ) | FILED: March 16, 2021 |
| Respondent. | ) | |

**Appeal from the Circuit Court of Henry County
The Honorable James K. Journey, Judge**

**Before Division Three: Edward R. Ardini, Jr., P.J.,
and Alok Ahuja and Gary D. Witt, JJ.**

Timothy Kelley was convicted of first-degree assault after a jury trial in the Circuit Court of Henry County, and was sentenced to a fifteen-year term of imprisonment. After we affirmed Kelley's conviction and sentence on direct appeal, he filed a motion for post-conviction relief under Supreme Court Rule 29.15. The circuit court denied Kelley's post-conviction relief motion without an evidentiary hearing. Kelley appeals. Because we conclude that Kelley was entitled to an evidentiary hearing on certain of his claims, we affirm in part, reverse in part, and remand for further proceedings.

## Factual Background

Kelley was charged with first-degree assault, a class B felony, for attempting to cause serious physical injury to Bill Wilson by attempting to run Wilson over with a pickup truck.

The charge arose from an incident on September 9, 2013. At the time, Wilson was checking the mail at a sawmill which he owned on Highway 18 west of Clinton.

The sawmill had been closed since 2006. As he was checking the mail, Wilson saw a truck come "shooting out" of the sawmill's driveway onto the highway. Wilson decided to follow the truck to get its license plate number, suspecting that the driver had been stealing property from the sawmill. Kelley was driving the truck which Wilson saw and followed.

Wilson followed the truck for approximately three miles, until the truck turned off Highway 18 onto Highway P, and then into a residential driveway. According to Wilson, he parked his vehicle next to the truck, got out, approached the driver's window of the pickup truck, and asked Kelley, "what the hell are you doing behind the sawmill?" Wilson admitted he was "probably talking loudly." Kelley responded that he was "checking something"; Wilson did not hear the rest of what Kelley said because Wilson was walking toward the back of Kelley's truck to get the license plate number. Wilson carried a pen in one hand and a letter in the other. He was not carrying any weapons.

As he "crossed behind the pickup," Wilson saw "a cut or two" of "aluminum, black-coated wire" in the bed of Kelley's truck. Wilson testified that he had similar wire at the sawmill. He admitted, however, that he could not say whether the wire in Kelley's truck had come from his sawmill, and never checked to see if he was missing any wire. After seeing the wire, Wilson said to Kelley, "hell, you were stealing copper."

Wilson testified that he accused Kelley of stealing as he was standing behind the truck, or "[a]s [he] stepped behind it." Wilson claimed that, after he accused Kelley of stealing, the "truck was coming at me. It hit me." Wilson testified that the truck began moving too quickly for him to get out of the way. Wilson "got ahold of [the truck] somehow," and he "lifted" and "pushed" it. The "tires were spinning" and the "motor moaning." Wilson testified that Kelley "was doing all he could do with" the truck's power; "I could hear the motor revving and the moan of that S-10

2

engine." While he held the truck at bay, Wilson claimed that he saw Kelley "glaring" at him with a "snarl." Wilson "was able to keep [the truck] off [him]," as the truck was not "powerful enough" to run him over, but it slowly pushed him back across the highway. Wilson thought that Kelley had been trying to kill him, and said that he would have felt justified in shooting Kelley if he had a gun.

According to Wilson, after Kelley backed the truck across the highway, he put the truck in drive and drove away. Wilson wrote down the license plate number and called 9-1-1.

Kelley testified in his own defense. According to Kelley, he pulled off the highway, and parked behind Wilson's sawmill, because he had defecated in his pants while driving and needed somewhere private where he could attempt to clean himself up before proceeding on his way. Kelley testified that after he exited the sawmill, he pulled over when he saw Wilson following him, since he assumed that Wilson wanted to talk to him. As Wilson approached Kelley's truck, Kelley testified that Wilson was "swinging his arms and yelling something" that Kelley could not hear. Although the windows of Kelley's truck were up, Wilson was yelling loudly enough that Kelley, who is deaf in both ears, could hear him without his hearing aids. Kelley was "frightened" because Wilson is "a big boy." Kelley testified that he "was wanting to get out of there" to "[g]et away from him." Kelley began by backing up his truck so that he could re-enter the highway. According to Kelley, Wilson "was beside the truck when I was backing up." Kelley testified that, as he was backing out "slow[ly]," Wilson hit the back of the truck and threw his arms up. Kelley saw that he had enough room to pull forward at that point, so he did, and left.

Kelley testified that he did not intend to run Wilson over; he just wanted to "get out of there," to "get away from [Wilson]." Kelley saw that Wilson was behind

3

his truck at some point, but he denied that he continued driving backwards after he realized that Wilson was behind the truck.

Sheriff's Deputy Brad Sadoorus responded to Wilson's 9-1-1 call and took Wilson's statement.

The truck Kelley had been driving was located on Army Corps of Engineers property. The vehicle was well off the road, obscured by vegetation. A coil of wire was found approximately fifteen yards from the truck, behind a tree. Kelley admitted to removing the wire from the truck bed. Kelley claimed that he had gotten the wire from a friend a couple of weeks earlier, and that he had intended to sell it for scrap. Kelly testified that he removed the wire from the truck because the truck belonged to his brother, and he knew that his brother would not allow him to continue using the truck after the incident with Wilson. Kelley claimed that, because he would no longer be able to use the truck, he would no longer be able to haul scrap, and therefore had no further use for the wire.

Kelley was placed under arrest and searched by Deputy Sadoorus. Deputy Sadoorus testified that he did not remember smelling anything unusual during his search of Kelley's person, or during their drive to the jail.

Detective Lee Hilty went to the scene of the assault. Detective Hilty looked at the tire tracks on the road and spoke with Wilson about what had occurred. He testified that "[t]here were spin marks with both tires from this vehicle here going on to the pavement." Detective Hilty testified that he could tell that the vehicle had been backing onto the pavement due to "the direction . . . the gravel was thrown and the fact that there was solid print of the other tires that followed." Detective Hilty testified that there were "some black marks start[ing] at the edge of the pavement," and lighter black marks across the highway, with one wheel going off the roadway on the far side. He testified that "then you could see that the dirt was turned as if the vehicle was put in a forward gear, thrown back towards the ditch and then

4

marks going up the highway." Detective Hilty testified that the tire tracks he observed "matched" Wilson's account of what had happened.

At trial, the defense called two character witnesses: Kelley's friend Jane Duncan, and his former boss John Krahenbuhl. Both witnesses testified to Kelley's reputation for honesty in the community. Krahenbuhl also stated that he trusted Kelley, and that Kelley never stole from him despite multiple opportunities. On cross-examination, both witnesses were questioned regarding Kelley's prior criminal convictions.

During the State's closing argument, it emphasized to the jury that the case "goes back to credibility. Who is more credible?" The prosecutor ridiculed Kelley's claim that he had defecated while driving, and parked behind the sawmill to remove his soiled underwear and clean himself up:

> So again, it really comes down to whether you're going to believe Mr. Wilson or you're going to believe this ridiculous poop story that the Defendant testified to. And I hate to just get up here and to say something like that, but it's frankly one of the silliest things I've heard in my more than 30 years working in the criminal justice system, as a police officer, as a private practice attorney, as a prosecutor, an observer of the criminal justice system, and a teacher of criminal justice and a teacher of police academy, I've heard it all, I thought. Until today. I have never heard I pooped my pants as being a defense. But that's what you all heard.

The prosecutor argued that it "borders on being insulting to your-all's intelligence" for Kelley to have testified to "this ridiculous poop story."

The prosecutor ended his rebuttal argument by emphasizing that Kelley had a powerful motive to assault Wilson: to avoid punishment for having stolen wire from Wilson's sawmill.

> I don't know if I have too much more to say about all of this. I think it's just, again, a common sense thing. You know, the Defendant tried to run over Bill Wilson that day. I think you can reasonably infer that he was back there behind the sawmill, was in the process of stealing him some wire, he got spooked by Bill Wilson showing up to

5

check his mail, he ran down the highway. He didn't want to go back to prison again, so he tried to run over the guy who was a witness.

The jury convicted Kelley of assault in the first degree. The court found Kelley to be a prior and persistent offender, and sentenced him to fifteen years' imprisonment.

In his new trial motion, Kelley argued, among other things, that the court had erred in admitting evidence suggesting that Kelley had stolen wire from Wilson's sawmill. In response, the State argued that the "existence of that wire in the back of the truck . . . showed motive for the Defendant to attempt to run over the victim in this case."

Kelley appealed. His appellate counsel raised two Points: first, that there was insufficient evidence to convict him; and second, that the trial court plainly erred in admitting evidence of Kelley's purported theft of wire from the sawmill, because Kelley had not been charged with stealing. We affirmed Kelley's conviction and sentence in an unpublished order and memorandum. *State v. Kelley*, 507 S.W.3d 181, No. WD78735 (Mo. App. W.D. Jan. 17, 2017) (*mem.*). In rejecting Kelley's claim that it was plain error to admit evidence concerning the wire, we observed:

> Not only was evidence of the wire relevant in establishing Kelley's intent and motive to strike Wilson with his pickup truck, but, as "part of the circumstances or the sequence of events surrounding the offense charged," it also was relevant in presenting a "complete and coherent picture of the events" surrounding the assault.

*Id., mem.* at 10-11 (citation omitted).

On March 24, 2017, Kelley filed his *pro se* motion for post-conviction relief. Appointed counsel filed an amended motion on July 10, 2017. The amended motion claimed, on eleven grounds, that Kelley received ineffective assistance from both his trial and appellate counsel. The circuit court denied Kelley's amended motion without conducting an evidentiary hearing. Kelley appeals.

6

## Standard of Review

> This Court will affirm the judgment of the motion court unless its findings and conclusions are clearly erroneous. The motion court's judgment is clearly erroneous only if this Court is left with a definite and firm impression that a mistake has been made. The motion court's findings are presumed correct. Additionally, a movant bears the burden of proving the asserted claims for relief by a preponderance of the evidence.
>
> Pursuant to Rule 29.15, an evidentiary hearing is not mandatory when the motion and record conclusively show that the movant is not entitled to relief. Courts will not draw factual inferences or implications in a Rule 29.15 motion from bare conclusions or from a prayer for relief. To be entitled to an evidentiary hearing, Movant's motion must: (1) allege facts, not conclusions, warranting relief; (2) raise factual matters that are not refuted by the file and record; and (3) raise allegations that resulted in prejudice.

*Johnson v. State*, 406 S.W.3d 892, 898 (Mo. 2013) (citations and internal quotation marks omitted).

> Nothing in the text of Rule 29.15 suggests that the pleading requirements are to be construed more narrowly than other civil pleadings. Thus, a movant may successfully plead a claim for relief under Rule 29.15 by providing the motion court with allegations sufficient to allow the motion court to meaningfully apply the *Strickland* standard and decide whether relief is warranted.

*Wilkes v. State*, 82 S.W.3d 925, 929 (Mo. 2002) (citing *Morrow v. State*, 21 S.W.3d 819, 824 (Mo. 2000)). "In reviewing the motion court's dismissal [of a 29.15 motion without an evidentiary hearing], this Court is required to assume every pled fact as true and to give the pleader the benefit of every favorable inference which may be reasonably drawn therefrom." *Wooldridge v. State*, 239 S.W.3d 151, 154 (Mo. App. E.D. 2007) (citation omitted).

"In order to ensure that claims are decided accurately, the rules encourage evidentiary hearings." *Wilkes*, 82 S.W.3d at 929 (citing Rule 29.15(h)).

Claims of ineffective assistance of counsel are assessed under the standards announced in *Strickland v. Washington*, 466 U.S. 668 (1984).

To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must show by a preponderance of the evidence that his or her trial counsel failed to meet the *Strickland* test in order to prove his or her claims. Under *Strickland*, a movant must demonstrate that: (1) his or her counsel failed to exercise the level of skill and diligence that a reasonably competent counsel would in a similar situation, and (2) he or she was prejudiced by that failure.

A movant must overcome the strong presumption that counsel's conduct was reasonable and effective. To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance. Trial strategy decisions may be a basis for ineffective counsel only if that decision was unreasonable. Strategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable.

To establish relief under *Strickland*, a movant must prove prejudice. Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Johnson*, 406 S.W.3d at 898–99 (citations and internal quotation marks omitted).

## Discussion

On appeal, Kelley claims in eight separate Points that his trial and appellate counsel provided him with constitutionally ineffective assistance.

## I.

In Point I, Kelley argues that his trial counsel was ineffective for failing to request that the circuit court instruct the jury on self-defense. In Point III, Kelley argues that his appellate counsel was ineffective for failing to argue in his direct appeal that the circuit court plainly erred in failing to give the jury a self-defense instruction. Because these two claims fail for similar reasons, we address them together.

"In determining whether a defendant is entitled to an instruction, this Court has long held if there is substantial evidence to support the theory propounded in the requested instruction, the court is required to submit that instruction to the jury." *State v. Barnett*, 577 S.W.3d 124, 126 (Mo. 2019) (citation omitted).

8

"Sufficient 'substantial' evidence is provided if there is 'evidence putting a matter in issue.'" *State v. Bruner*, 541 S.W.3d 529, 535 (Mo. 2018) (citation omitted). "The burden of producing evidence sufficient to inject self-defense is a minimal burden." *Id.* at 530.

"[A] court must view the evidence in a light most favorable to the defendant in order to determine whether the evidence was sufficient to support and authorize instructions on the mentioned matters." *Barnett*, 577 S.W.3d at 126 (citation and internal quotation marks omitted). "Substantial evidence of self-defense requiring instruction may come from the defendant's testimony alone . . . [and] even when th[e] evidence [supporting self-defense] is inconsistent with the defendant's testimony." *State v. Westfall*, 75 S.W.3d 278, 280–81 (Mo. 2002). "If the evidence tends to establish the defendant's theory, or supports differing conclusions, the defendant is entitled to an instruction on it," *id.* at 280, because "any conflict in the evidence is to be resolved by a jury properly instructed on the issues." *State v. White*, 222 S.W.3d 297, 300 (Mo. App. W.D. 2007) (citation omitted; overruled on other grounds by *Barnett*, 577 S.W.3d at 133).

In their briefing, Kelley and the State argue at length as to whether the force Kelley used against Wilson constituted deadly force. The standards for establishing self-defense vary, depending on whether the defendant employed deadly force.

> Section 563.031.1 authorizes the use of physical force when and to the extent a person reasonably believes such force is necessary to defend from what that person reasonably believes to be the use or imminent use of unlawful force by the other person. In contrast, deadly force may only be used in self-defense when necessary to protect oneself against death or serious physical injury. The use of deadly force also requires "[s]ome affirmative action, gesture, or communication by the person feared, indicating the immediacy of the danger, the ability to avoid it, and the necessity of using deadly force."
>
> "Deadly force" includes physical force that a defendant uses either with the purpose of causing or with knowledge it will "create a substantial risk of causing death or serious physical injury." "Serious

9

physical injury" is statutorily defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." The question of whether deadly force was used depends not only on the amount of force used but also on the defendant's purpose to cause, or awareness of the likelihood of causing, death or serious physical injury.

*Westfall*, 75 S.W.3d at 282 (footnote citations omitted).

In rejecting Kelley's self-defense-related claims, the circuit court found "[t]here was no evidence that the Movant was met with any use of unlawful force, much less deadly force," which would justify a self-defense instruction. This conclusion was not clearly erroneous.

Only two witnesses testified to the incident for which Kelley was prosecuted: Kelley himself, and Wilson. Kelley's testimony cannot provide substantial evidence requiring a self-defense instruction, because he did not testify that he intentionally used force against Wilson at all. According to Kelley, he began slowly backing up his truck while Wilson was standing *beside* the truck, not behind it. Kelley testified that he merely wanted to get away from Wilson, and he specifically denied that he was trying to run Wilson over. Kelley testified that he stopped driving his truck backward when he saw Wilson behind it, and put the truck in a forward gear and drove away.

Kelley's testimony suggests that he never intended to cause physical injury to Wilson, and that if his truck in fact approached Wilson as Kelley was backing up, it was accidental (and was caused by Wilson moving behind the truck after Kelley began driving in reverse). Kelley's claim of a lack of intent to assault Wilson, and that any contact or near-contact was accidental, may have provided the jury with a basis to acquit him – but it did not constitute substantial evidence supporting a self-defense instruction.

In *Bruner*, 541 S.W.3d 529, the Missouri Supreme Court found that a defendant's testimony that he had acted unintentionally in shooting a victim could

10

not support a self-defense instruction, for reasons that are equally applicable here. The Court explained that a defendant's argument that he was entitled to a self-defense instruction was not

> helped by his testimony that he suffered from acute stress disorder which rendered his conduct in shooting Mr. Moore unintentional and as if it occurred "in a dream." That defense is inconsistent with self-defense, which "constitutes an intentional but justified killing, whereas accident connotes an unintentional killing. Self-defense and accident are therefore inconsistent." For this reason, an unintentional act, such as Mr. Bruner's description of the shooting "like it wasn't even me," is not consistent with self-defense. Of course, the fact Mr. Bruner testified he did not deliberately shoot at the victim would not preclude the submission of self-defense if other evidence had injected the defense. But no other evidence was offered supportive of self-defense.

*Id.* at 538-39 (citations omitted). As in *Bruner*, Kelley's testimony that he had no intent of assaulting Wilson, and that any threat to Wilson's physical safety caused by Kelley's driving was accidental, "is not consistent with self-defense." While Kelley's testimony would not have *foreclosed* a self-defense instruction if other evidence supported it, Kelley's testimony itself does not provide an evidentiary basis requiring that the jury be instructed on self-defense.

Wilson's testimony likewise does not justify a self-defense instruction in this case. Wilson testified at trial that Kelley began backing up his truck while Wilson was standing at the back of Kelley's truck, or as Wilson "stepped behind it." At that point, when Wilson was at the back of Kelley's pickup truck, we fail to see how any jury could find that Kelley was subject to "the use or imminent use of unlawful force" by Wilson as required by § 563.031.1, RSMo. Wilson did not have a gun, a projectile, or any other instrument with which he could have stricken Kelley from his position behind the truck. Self-defense "requires a real, specific, actual and immediate threat of bodily violence to which the defendant's actions are an appropriate and proportional response." *State v. Harris*, 870 S.W.2d 798, 809-10 (Mo. 1994). Wilson's testimony concerning his location when Kelley began backing

11

up his truck defeats any claim that Kelly was confronted with an "imminent use of force" by Wilson.

Wilson's testimony does not support the submission of self-defense for an additional reason. According to Wilson, Kelley put his truck in reverse and backed it up with full knowledge that Wilson was behind it. Wilson testified that Kelley was looking at Wilson in his rear-view mirror as he backed up, glaring and snarling. Wilson also testified that Kelley was revving the vehicle's engine, and attempting to use the truck's full power to run Wilson over (although Wilson was able to lift the truck's tailgate enough that the tires spun on the gravel surface).

If the jury accepted Wilson's testimony, the force which Kelley used could only be characterized as "deadly force." Wilson's testimony that Kelley was angrily and intentionally seeking to run him over, using the full power of his pickup truck, established that Kelley was using "deadly force" – namely, "physical force which the actor uses with the purpose of causing or which he or she knows to create a substantial risk of causing death or serious physical injury." § 563.011, RSMo.

Kelley did not have any justification for using deadly force against Wilson, however. There was no evidence that Wilson was armed. While he was angry and may have been yelling at Kelley as he approached Kelley's vehicle, this would not justify Kelley's use of deadly force against him. The Supreme Court rejected a similar self-defense claim in *Bruner*:

> the only relevant evidence on Mr. Bruner's objective and subjective state of mind is that [the victim] was swearing and threatening him and he believed [the victim] was about to make unwanted or offensive contact by grabbing him. Such evidence is not sufficient to justify deadly force. Words alone are insufficient to support a claim of self-defense. Neither is deadly force justified in response to fear of being grabbed or even punched. At best, Mr. Bruner showed a fear of a simple assault or battery, but "[d]eadly force cannot be used to repel a simple assault and battery."

541 S.W.3d at 539 (citations omitted).

12

Because neither Kelley's testimony nor Wilson's testimony would support a self-defense instruction in this case, Kelley's trial counsel was not ineffective for failing to request such an instruction. Point I is denied.

In Point III, Kelley contends that his appellate counsel was ineffective for failing to argue, in Kelley's direct appeal, that the circuit court had plainly erred by failing to instruct the jury on self-defense. As we have explained above, however, no self-defense instruction was warranted here. "Appellate counsel is not ineffective for failing to raise a non-meritorious claim on appeal." *Voss v. State*, 570 S.W.3d 184, 194 (Mo. App. E.D. 2019) (citation and internal quotation marks omitted).

Point III is denied.

## II.

Kelley's second Point argues that, even if the existing trial record did not justify submission of a self-defense instruction, his trial counsel was ineffective for failing to elicit *additional* testimony from Kelley to inject the issue of self-defense.

The circuit court rejected this claim on the basis that Kelley's amended motion was deficient because it "only speculate[d] what might have been the testimony of the Movant." According to the circuit court, "[a] post-conviction movant's speculation about testimony of prospective witnesses does not demonstrate that he was prejudiced by his counsel's failure to secure testimony and, thus, movant failed to prove ineffective assistance of counsel." The circuit court cited *Tettamble v. State*, 818 S.W.2d 331, 332 (Mo. App. S.D. 1991), to support its characterization of Kelley's allegations as "speculative".

The circuit court clearly erred by rejecting Kelley's claim on the basis that he was merely speculating as to the testimony he could have offered at trial. Kelley's motion specifically alleged what his testimony would have been, if counsel had inquired. This was enough. Without an evidentiary hearing, Kelley was of course unable to *prove* what his trial testimony would have been. But his amended motion

13

was not required to _prove_ his claims for post-conviction relief – it was only required to _allege_ those claims. An amended motion is incapable of *proving* a movant's right to relief, and it is not deficient for failing to do so. The *Tettamble* case cited by the circuit court is distinguishable for an obvious reason: in *Tettamble, the post-conviction movant was granted an evidentiary hearing.* At that hearing, the movant testified as to what he claimed other witnesses would have said, had they been called to testify at his trial. 818 S.W.2d at 332. It is this secondhand hearsay testimony of the movant at an evidentiary hearing – recounting what the movant claimed *other witnesses* would have testified – which *Tettamble* characterized as "speculation." *Id.* *Tettamble* did not suggest that the allegations of an amended motion, concerning what witnesses would have testified if called, constituted improper speculation.

Though the circuit court's reason for denying Kelley's claim was erroneous, we "may affirm the judgement on any legal ground supported by the record if the motion court arrived at the correct result." *Greene v. State*, 332 S.W.3d 239, 246 (Mo. App. W.D. 2010) (citation omitted). In this case, the allegations of Kelley's amended motion were insufficient to state a claim that he would have been entitled to a self-defense instruction if his trial counsel had elicited further testimony from him. As we have explained in § I, above, Kelley's trial testimony was wholly inconsistent with self-defense: he testified that Wilson was standing *beside* his truck, not behind it, when Kelley began backing up; and Kelly also testified that he never intended to use force against Wilson, but was merely trying to leave the scene. In his amended motion, Kelley alleged that his trial counsel should have elicited the following additional testimony from Kelley: that Kelley believed Wilson was "coming at him; he feared that Wilson was about to drag him out of the truck; and he could tell from Mr. Wilson's angry demeanor that he was not willing to talk calmly." Kelley's amended motion also alleged that he would have testified that he

14

reversed the truck in self-defense, believing the force used was necessary to defend himself against Wilson's imminent use of unlawful force with his hands.

Kelley's claim that he would have testified that he used his truck in self-defense, using only such force as was necessary to defend himself, is flatly inconsistent with his trial testimony, where he testified that he did not intentionally use any force whatsoever against Wilson. But the additional testimony Kelley hypothesizes suffers from a more fundamental flaw. All of this additional testimony relates solely to Kelley's *state of mind*: what he believed; what he feared; what he intended. None of it changes *the facts* to which he testified – that Wilson was beside the truck when Kelley began reversing; that Kelley reversed slowly only until he could drive away; that Kelley's truck never hit Wilson; and that Kelley never intended to run Wilson over. And Kelley's state of mind, alone, could not justify a self-defense instruction. Whether a defendant acted in lawful self-defense is gauged using an "objective not a subjective standard." *Hendrix v. State*, 369 S.W.3d 93, 99 (Mo. App. W.D. 2012) (citation and internal quotation marks omitted). "The reasonableness of the belief [that use of force in self-defense is necessary] is determined from an objective test that measures conduct based on what a hypothetical ordinary reasonable and prudent person would have believed and how they would have reacted." *Id.* at 98 (citation and internal quotation marks omitted); *accord*, *State v. Edwards*, 60 S.W.3d 602, 612 (Mo. App. W.D. 2001). Thus, Kelley's fears or beliefs as to what Wilson might do, or what Kelley thought he had to do in response, could not establish a basis for a self-defense instruction, without evidence of <u>facts</u> which would justify a hypothetical reasonable person in sharing Kelley's belief that the use of force was necessary.

The additional testimony Kelley postulates in his amended post-conviction relief motion would not have required submission of a self-defense instruction, even if his counsel had elicited it.

15

Point II is denied.

## III.

In Point IV, Kelley claims that the circuit court clearly erred in denying his claim that trial counsel was ineffective for failing to offer into evidence a video recording in which Kelley's friend, Randall VanEaton, stated that he had given Kelley the wire found in Kelley's truck. VanEaton was deceased by the time of trial.

VanEaton's statements on the video recording were inadmissible hearsay. "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value. Hearsay statements generally are inadmissible." *State v. Brandolese*, 601 S.W.3d 519, 534-35 (Mo. 2020) (citations and internal quotation marks omitted). Kelley was plainly seeking to introduce VanEaton's statements for the truth of what VanEaton asserted: that he had given Kelley the wire which Wilson later accused Kelley of stealing.

Kelley has failed to identify any basis for admission of VanEaton's hearsay statements. In his amended motion, Kelley argued that the video would have been admissible either under the "rule of completeness," or to show VanEaton's state of mind. Neither principle would have established the admissibility of VanEaton's statements.

The rule of completeness provides that, "where either party introduces part of an act, occurrence, or transaction, the opposing party is entitled to introduce or to inquire into other parts of the whole thereof in order to explain or rebut adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary." *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 50 (Mo. 2006) (citation and internal quotation marks omitted). "This rule seeks to ensure that an exhibit is not admitted out of context." *State v. Ellis*, 512 S.W.3d 816, 826 (Mo. App. W.D. 2016) (citation and internal quotation marks omitted). The

16

rule of completeness is not implicated here, however, because the State did not seek to introduce into evidence any portion of VanEaton's statement.

Nor were VanEaton's hearsay statements admissible to establish his state of mind.

> An out-of-court statement of the declarant's present mental condition is . . . admissible as an exception to the hearsay rule so long as the statements are relevant and their relevancy outweighs their prejudicial effect. This exception is generally limited to cases where the hearsay declarations of mental condition are especially relevant.

*State v. Taylor*, 298 S.W.3d 482, 493 (Mo. 2009) (citations and internal quotation marks omitted). VanEaton's state of mind was not at issue in this case. In addition, his statements concerning whether he had given wire to Kelley at some point in the past would not have been relevant to show his mental state, even if his state of mind was somehow relevant. *See, e.g.*, *State v. Bell*, 950 S.W.2d 482, 484 (Mo. 1997) (to fall within "state of mind" exception, out-of-court statement must not be a "mere 'narration of past events,'" but "'must refer to the intention, design or state of mind of the declarant'" (footnote citations omitted)); *State v. Martinelli*, 972 S.W.2d 424, 436 (Mo. App. E.D. 1998) ("Statements which merely recount past events do not fall within the state of mind exception unless they are a 'contemporaneous statement of fear, emotion, or any other mental condition.'"; finding exception inapplicable to "a narration which does not involve an indication of a specific emotion"; quoting *Bell*, 950 S.W.2d at 484). The "state of mind" exception to the hearsay rule is inapplicable here.

Because VanEaton's recorded statements would not have been admissible, Kelley's trial counsel was not ineffective for failing to offer them in evidence. "Trial counsel will not be found ineffective for failing to present inadmissible evidence." *Tisius v. State*, 519 S.W.3d 413, 422 (Mo. 2017) (rejecting claim that counsel was

17

ineffective for failing to offer hearsay evidence; citation omitted). The circuit court did not clearly err in rejecting this claim without an evidentiary hearing.

Point IV is denied.

## IV.

In Point VI, Kelley argues that his trial counsel provided ineffective assistance when counsel failed to object to statements made during the prosecution's closing argument. Kelley contends that the following argument was objectionable because it improperly suggested that the prosecutor had personal knowledge of relevant facts, derived from extra-record sources:

> So again, it really comes down to whether you're going to believe Mr. Wilson or you're going to believe this ridiculous poop story that the Defendant testified to. And I hate to just get up here and to say something like that, but it's frankly one of the silliest things I've heard in my more than 30 years working in the criminal justice system, as a police officer, as a private practice attorney, as a prosecutor, an observer of the criminal justice system, and a teacher of criminal justice and a teacher of police academy, I've heard it all, I thought. Until today. I have never heard I pooped my pants as being a defense. But that's what you all heard.

The circuit court denied Kelley's claim without an evidentiary hearing based on its conclusions that the prosecutor's closing argument was not improper; that the argument was not prejudicial, even if it was objectionable, given the overwhelming evidence of Kelley's guilt; and that trial counsel's decision not to object was a matter of reasonable trial strategy.

The circuit court did not clearly err in concluding that an objection to the prosecutor's comments would not have been successful. To prevail on a claim of ineffective assistance for failure to object, Kelley was required to show, at a minimum, that "the objection would have been meritorious." *Hays v. State*, 360 S.W.3d 304, 312 (Mo. App. W.D. 2012) (citation omitted).

"The State has wide latitude in closing argument . . . . The prosecutor has the right to comment on the evidence and the witnesses, including their demeanor and credibility, presented at trial from the State's viewpoint." *Harding v. State*, 613 S.W.3d 522, 532 (Mo. App. E.D. 2020) (citation omitted). The State "may even belittle and point to the improbability and untruthfulness of specific evidence." *State v. McFadden*, 369 S.W.3d 727, 752 (Mo. 2012) (citation and internal quotation marks omitted). However, "[a] prosecutor may not argue facts outside the record" or give a "statement of personal opinion or belief not drawn from the evidence," as such assertions "are apt to carry much weight against the accused when they should carry none." *State v. Storey*, 901 S.W.2d 886, 900 & 901 (Mo. 1995) (citations and internal quotation marks omitted).

We do not condone the prosecutor's reference in closing argument to his thirty years of criminal justice-related experience. The prosecutor's personal legal experience was not in evidence, and it was irrelevant to any issue presented in Kelley's case. Nevertheless, the circuit court did not clearly err when it determined that the prosecution's closing argument was not improper, because in context it constituted a comment on the evidence, and did not suggest knowledge of any extra-record facts.

The Southern District faced a similar issue in *State v. Riggs*, 520 S.W.3d 788 (Mo. App. S.D. 2016). *Riggs* found no plain error where a prosecutor's closing argument made reference to the fact that the prosecutor had made the decision to file charges in this case, as opposed to other sexual-assault cases, based on his assessment of the evidence in the present case. The prosecutor argued:

> There's a lot of charges that come across the desk. . . . I'm talking about these sexual crimes. And there are a lot of cases I receive that I don't file on. It's not necessarily that I don't believe the victim, but they're just not provable. Sometimes people are in divorce cases and there's been a bunch of nonsense going on back and forth, and sometimes there's neighbors and there's relative squabbles, you know.

19

And I've got to pick the ones that I think a jury will believe, you know. Of course, sometimes I might see it a little differently than what you all might see. That's why you're here to determine the facts. I do try to pick the cases I think are serious, and this is a serious case. And I happen to believe that the Defendant did just what he's charged with in this case. Of course, you'll be the ultimate decider of that.

*Id.* at 804 (internal alteration omitted). The court found that this argument did not amount to plain error:

Improper vouching occurs when the State implies that it has facts establishing the veracity of witnesses and the truthfulness of its case that are not before the jury for its consideration. The State may, however, express personal opinions on matters, including guilt, where they are fairly based on the evidence.

The challenged statements here, when taken in context, expressed the prosecutor's view that: (1) this was not a case of unsubstantiated charges between parties as part of an ongoing dispute; and that (2) based on the evidence, Defendant was guilty of the crimes charged. The argument did not imply a knowledge of outside facts, nor did it improperly vouch for the credibility of the state's witnesses.

*Id.* (citations omitted); *see also State v. Black*, 50 S.W.3d 778, 791–92 (Mo. 2001) (finding no improper vouching on plain error review where prosecutor argued in closing that, "I realize the magnitude of the decision that you have to make [about imposing the death penalty], because I had to make it first"); *State v. Chism*, 252 S.W.3d 178, 187 (Mo. App. W.D. 2008) (argument that the State charged defendant with a particular offense, because it believed that the evidence established that offense, was not improper; "the prosecutor's comments did not imply that it based the belief of defendant's guilt on any outside facts"); *State v. Collins*, 150 S.W.3d 340, 351-52 (Mo. App. S.D. 2004) (prosecutor's closing argument suggested that if law enforcement had intended to suborn perjury, the witnesses' testimony would have been perfectly consistent, and argued that prosecution was only interested in "seeking justice," and had "played it straight"; argument not improper because it "did not assert personal knowledge from outside the record").

In this case, the circuit court did not clearly err in concluding that the prosecutor's closing argument merely attacked the credibility of the explanation Kelley had offered for why he was behind Wilson's sawmill. Although the prosecutor argued that he had never previously heard such a "ridiculous" story, the prosecutor's argument did not imply special knowledge of facts outside the record, or outside the common experience of the jurors themselves. Because the prosecutor's argument could be read simply as attacking the credibility of Kelley's testimony, the circuit court did not clearly err in concluding that an objection to that argument would have been unsuccessful, and that no evidentiary hearing was required on this claim.

Point VI is denied.

## V.

In Points V, VII, and VIII, Kelley argues that his trial counsel provided ineffective assistance when he failed to present particular evidence at trial, or failed to examine particular witnesses more fully. Because these claims are similar, and because we conclude that Kelley was entitled to an evidentiary hearing on these claims, we address them together.

## A.

In Point VII, Kelley argues that his trial counsel was ineffective for failing to cross-examine Wilson and Deputy Sadoorus concerning Wilson's prior inconsistent statements regarding the assault.

At Kelley's trial, a critical area of disagreement between the testimony of Kelley and Wilson was where Wilson was standing when Kelley began backing up his truck. Wilson testified that he "crossed behind the pickup," accused Kelley of stealing copper, and _then_ the pickup began backing up and hit him. On cross-examination, Wilson indicated that Kelley's truck "didn't move until I said, hell, you're stealing copper," which occurred "as [he] stepped behind" the truck. Wilson

21

specifically denied that "the pickup [was] moving before [he] stepped in behind it," or that "the pickup was moving as [he was] stepping behind it."

On the other hand, Kelley testified that Wilson was standing _beside_ Kelley's truck when Kelley began backing up, and that Wilson thereafter moved to the back of the truck, at which point Kelley stopped backing, put his truck in a forward gear, and left.

Deputy Sadoorus interviewed Wilson shortly after the alleged assault. The report Deputy Sadoorus prepared stated:

> Wilson stated he took a few steps and looked into the bed of the truck and noticed rolls of electrical wire. Wilson then stated to the driver "You have been stealing wire." ***The driver then started to back the truck up to leave and Wilson went to the rear of the truck to obtain the license number***.

(Emphasis added.)

Although Kelley's trial counsel had a copy of Deputy Sadoorus' report, he did not question Wilson or Deputy Sadoorus about it. Kelley alleged in his amended motion for post-conviction relief that counsel's failure to exploit Wilson's prior inconsistent statement constituted ineffective assistance of counsel. The circuit court denied this claim without an evidentiary hearing, finding that Kelley was not prejudiced because "the inconsistencies were insignificant and considering the vast evidence of guilt adduced at trial, the outcome of the trial was not influenced."

The circuit court clearly erred in rejecting this claim without an evidentiary hearing. We recognize that

> [f]ailure to impeach a witness does not generally warrant relief for ineffective assistance of counsel where the facts, even if true, do not establish a defense. The decision to impeach is presumed to be a matter of trial strategy, and to overcome such presumption, a movant must demonstrate that the decision was not a matter of trial strategy and that the impeachment would have provided him with a defense or would have changed the outcome of the trial.

_Wren v. State_, 313 S.W.3d 211, 219 (Mo. App. E.D. 2010) (citations omitted).

22

Despite this general principle, however, an attorney's failure to cross-examine prosecution witnesses with their prior inconsistent statements may constitute ineffective assistance of counsel justifying post-conviction relief, if the prior inconsistent statements "related directly to the central issue," "the key issue in contention between the parties." *Black v.* State, 151 S.W.3d 49, 56 (Mo. 2004). In *Black*, the Missouri Supreme Court explained that impeachment with a prior inconsistent statement is only considered to be "collateral" "if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed." *Id.* at 55 (citation and internal quotation marks omitted). On the other hand, a prior inconsistent statement is *not* considered collateral "if the alleged discrepancy involves a crucial issue directly in controversy or relates to any part of the witness' account of the background and circumstances of a material transaction." *Id.* (citation and internal quotation marks omitted).

Wilson's statement on the day of the assault, as recorded in Deputy Sadoorus' report, is directly contrary to Wilson's trial testimony. In fact, Wilson's extrajudicial statement corroborates *Kelley's* version of events: that he began backing up while Wilson was beside his truck, and that Wilson *thereafter* moved behind the truck.

The discrepancy between Wilson's trial testimony and his prior statement does not involve a collateral matter. As Kelley's Brief argues, Wilson's position at the time Kelley's truck began moving was "one of the key facts in contention, if not *the* key fact in contention, at trial: whether Mr. Wilson was beside or behind the truck when Mr. Kelley began to back up." Wilson's location was critical to determining whether Kelley drove his truck in reverse with the purpose of causing serious physical injury to Wilson (an essential element of first-degree assault), or whether Kelley was instead merely moving his truck in order to get away from Wilson and avoid an escalating confrontation.

23

In its Brief, the State seeks to minimize the significance of Wilson's prior inconsistent statement by emphasizing that

> Wilson testified repeatedly at trial that appellant's truck did not start moving until after he was behind the truck. Wilson said that as he was crossing behind the pickup he saw the wire and made the comment about stealing wire. Wilson consistently testified on cross that the truck did not move until he was behind it. Wilson denied that the truck was moving as he stepped behind it. Wilson said as he stepped behind it, he looked in the bed and saw the wire, made the stealing comment, and then the truck moved. . . . Given Wilson's repeated consistent statements, Dep. Sadoorus's police report would not have been of great impeachment value, especially given that Wilson did not write out the report or make a written statement to the police.

(Record citations omitted.) By highlighting that Wilson "repeatedly" testified at trial that Kelley only began to back his truck _after_ Wilson was behind it, the State's own argument demonstrates the significance of the inconsistent statement Wilson made to Deputy Sadoorus on the day of the assault itself. If it was critical to the prosecution's case that Wilson "repeatedly" testify that he was behind Kelley's truck when Kelley began backing, it would be equally critical to Kelley's defense to show that Wilson had previously said exactly the opposite.[1]

The circuit court was also mistaken in characterizing this issue merely as one of "impeachment." As Kelley specifically argued in his amended motion, Missouri law provides that "a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

---

[1]    The State also argues that "the statement in the police report was likely not correct," because "Wilson would not have made the statement regarding stealing wire without having seen the wire in the back of the truck and this would not have been visible to him until he walked to the back of the truck." The State's argument ignores that Kelley's pickup truck had an open bed. Therefore, Wilson would have been able to look into the truck's bed as easily when standing _beside_ the truck, as when he was _behind_ it. In any event, any potential inaccuracy in Deputy Sadoorus' report cannot be resolved without an evidentiary hearing.

§ 491.074, RSMo. In light of this principle, "courts have recognized that 'a prior inconsistent statement can be the sole basis for a guilty verdict.'" *State v. Betts*, 559 S.W.3d 47, 55 (Mo. App. E.D. 2018) (citation omitted). If Kelley's counsel had confronted Wilson with his prior inconsistent statement, and laid a foundation for its admission, that statement would have served as substantive evidence corroborating Kelley's testimony that Wilson was located beside his truck – and thus out of harm's way – when Kelley began to back up his truck in order to leave, and that Wilson put *himself* in danger by stepping behind Kelley's moving truck in order to try to record Kelley's license plate number.

Despite the circuit court's assertion that there was "vast evidence of [Kelley's] guilt adduced at trial," in its closing argument the State itself recognized that the case "goes back to credibility. Who is more credible?" The State recognized that the only two witnesses to the purported assault provided conflicting accounts of what transpired between them, and that the jury's primary task was to resolve that conflict. Wilson's prior inconsistent statement could have had a significant effect on the jury's assessment of Wilson's and Kelley's relative credibility. Trial counsel's failure to exploit that statement cannot be dismissed, without an evidentiary hearing, on the basis that the evidence of Kelley's guilt was overwhelming.

Kelley was entitled to an evidentiary hearing on his claim that his trial counsel was ineffective for failing to cross-examine Wilson concerning the statement recorded in Deputy Sadoorus' report. Point VII is granted.

**B.**

In Points V and VIII, Kelley challenges the circuit court's rejection of two of his other claims, which argued that his trial counsel should have elicited additional testimony, or more fully cross-examined one of the State's witnesses. We conclude that the grounds on which the circuit court rejected these claims, without an evidentiary hearing, were clearly erroneous. We also conclude that an evidentiary

25

hearing on these additional claims is warranted, particularly in light of our remand for further proceedings on Kelley's claim concerning Wilson's prior inconsistent statement.

In Point V, Kelley argues that his trial counsel was ineffective for failing to elicit additional testimony from defense witness John Krahenbuhl. Krahenbuhl testified at Kelley's trial solely as a character witness. Kelley's amended motion alleges that his counsel should have elicited additional testimony from Krahenbuhl, that he had seen the wire in the back of Kelley's truck several days prior to the date of the alleged assault. According to Kelley, this testimony would have corroborated his own testimony, and rebutted the State's claim that Kelley had stolen the wire from Wilson's sawmill, giving Kelley a motive to assault Wilson.[2]

A claim of ineffective assistance based on counsel's failure to investigate and present evidence in support of a defense may be found when a movant specifically alleges and proves "what 'information his attorney failed to discover, that a reasonable investigation would have revealed it, and how the information would have aided his position.'" *Anderson v. State*, 66 S.W.3d 770, 776 (Mo. App. W.D. 2002) (quoting *Jones v. State*, 24 S.W.3d 701, 704 (Mo. App. E.D. 1999)).

---

[2] Notably, the trial transcript contains some discussion between Kelley and his trial counsel concerning whether the defense should present testimony from Krahenbuhl to rebut the State's suggestion that Kelley was stealing wire. When defense counsel called Krahenbuhl to testify, he informed the court that Krahenbuhl was being called solely as a character witness. Defense counsel advised the court that he would not ask Krahenbuhl about whether Kelley was stealing wire, because "[h]e's not charged with stealing wire." The following exchange then occurred between Kelley and his attorney:

> [Kelley]: . . . But I've also got the evidence about the wire.

> [Trial counsel]: No. We're not talking about that. You're not charged with that.

> [Kelley]: Yeah, but see that's why he said that – he said that – he left – I left his place and he thought I was stealing. Then he said he tried to kill me after I tried to run him over. That's two conflicting [versions of events].

26

The circuit court rejected Kelley's claim concerning Krahenbuhl's testimony on two grounds: (1) that Kelley was not prejudiced by counsel's failure to present this testimony because Wilson "acknowledged under cross-examination by trial counsel that he didn't know for sure if the wire in the back of [Kelley's] truck came from his sawmill"; and (2) that Kelley was merely engaging in "speculation" concerning what Krahenbuhl's testimony would have been (citing *Tettamble*, 818 S.W.2d 331).

As we explained in § II, above, Kelley's claim concerning Krahenbuhl's testimony cannot be dismissed as "speculation" under *Tettamble*, because Kelley has not been given an opportunity to _prove_ the substance of Krahenbuhl's testimony at an evidentiary hearing.

Likewise, the circuit court's rejection of this claim cannot be affirmed on the basis that it was not contested at trial whether Kelley had stolen the wire. During Kelley's trial, the State repeatedly referred to the allegedly stolen wire as Kelley's motive for assaulting Wilson; it also highlighted the fact that Kelley removed the wire from the truck, when he abandoned it on Corps of Engineers property, as evidence demonstrating Kelley's consciousness of guilt. In closing arguments alone, the State referenced the stolen wire seven separate times. Indeed, the State's last comments to the jury focused on the stolen wire:

> I don't know if I have too much more to say about all of this. I think it's just, again, a common sense thing. You know, the Defendant tried to run over Bill Wilson that day. I think you can reasonably infer that he was back there behind the sawmill, was in the process of stealing him some wire, he got spooked by Bill Wilson showing up to check his mail, he ran down the highway. He didn't want to go back to prison again, so he tried to run over the guy who was a witness. Thank you.

On direct appeal, when this Court rejected Kelley's claim that admission of evidence concerning the wire constituted plain error, we specifically observed that "evidence of the wire [was] relevant in establishing Kelley's intent and motive to strike Wilson

with his pickup truck." *State v. Kelley*, 507 S.W.3d 181, WD78735, *mem.* at 10-11. As the State itself argued in closing, whether Kelley had stolen wire from Wilson was highly relevant to deciding whether Kelley was attempting to kill or cause serious physical injury to Wilson by running him over, or was instead merely trying to flee from an angry confrontation.

It is also significant that Kelley testified that he had acquired the wire which Wilson saw in the back of his truck from a friend, and that the wire had been in the bed of his truck for two weeks before his encounter with Wilson. Krahenbuhl's testimony would have provided important corroboration for Kelley's testimony.

In Point VIII, Kelley argues that his counsel was ineffective for failing to more fully cross-examine Detective Lee Hilty concerning his analysis and conclusion of the tire marks found at the crime scene. At trial, Detective Hilty testified to his observations of the tire tracks at the scene; he testified that "was able to kind of figure out just from what was laid on the ground that [Wilson's] story matched what was – what was laid out on the ground as far as tire tracks and such."

The circuit court denied Kelley's claim of ineffective assistance without an evidentiary hearing, stating that Detective Hilty's testimony "was not expert testimony and did not require expert knowledge to testify what any witness could conclude." The fact that Detective Hilty may not have been testifying as an expert, even if accurate, would not fully resolve Kelley's claim. In his amended motion, Kelley alleged that his trial counsel should have cross-examined Detective Hilty concerning several weaknesses and gaps in his observations. Thus, the amended motion argued that counsel should have elicited testimony that Detective Hilty

> had minimal experience in collision reconstruction, had no experience
> in the mathematical analysis of crime scenes, collected no data from
> the scene, arrived more than two hours after the incident, and had no
> way of knowing for certain the tire marks belonged to Mr. Kelley's
> vehicle. It was imperative that counsel question Officer Hilty's
> qualifications and experience, the correctness of the facts upon which

28

his opinion was based, the correctness and accuracy of the methodology used, and the gaps in that methodology. Insofar as counsel failed to cross-examine Officer Hilty, his performance was deficient.

The core issue in Kelley's trial was assessing the relative credibility of Wilson and Kelley. Detective Hilty's testimony "that [Wilson's] story matched" the tire tracks Detective Hilty observed was important corroboration for Wilson's testimony. Detective Hilty's testimony may have been undermined in the jury's eyes if Kelley's trial counsel had emphasized on cross-examination that Detective Hilty arrived on the scene over two hours after the incident occurred; that the tracks he observed could have come from other vehicles, or been altered by other vehicles; and that Detective Hilty did not take measurements or collect other data.

Trial counsel's failure to elicit additional testimony from Krahenbuhl, or to more vigorously cross-examine Detective Hilty, may not present the same prospect of prejudice as counsel's failure to exploit Wilson's prior inconsistent statement. In determining whether Kelley was prejudiced by counsel's incompetence, however, the circuit court must assess the cumulative prejudicial impact of all deficiencies. *See, e.g.*, *Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020) ("Where, as here, the record shows more than one instance of deficient performance, the Sixth Amendment requires that we approach the prejudice inquiry by focusing on the cumulative effect of trial counsel's shortcomings."); *White v. Ryan*, 895 F.3d 641, 671-72 (9th Cir. 2018); *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1269 (11th Cir. 2012) ("the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement"); *Richards v. Quarterman*, 566 F.3d 553, 564, 571-72 (5th Cir. 2009).

Therefore, to the extent the circuit court concludes on remand that Kelley's trial counsel performed inadequately in failing to confront Wilson with his prior inconsistent statement; in failing to elicit testimony from Krahenbuhl concerning the wire in Kelley's truck; and/or in failing to cross-examine Detective Hilty more

29

thoroughly, the court must consider the cumulative prejudicial effect of those deficiencies in determining whether Kelley is entitled to post-conviction relief.

Points V and VIII are granted.

## Conclusion

The judgment of the circuit court denying Kelley's amended motion for post-conviction relief without an evidentiary hearing is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

_____
Alok Ahuja, Judge

All concur.